**BANQUE ARABE ET INTERNATIONALE D'INVESTISSEMENT, Plaintiff–Appellant–Cross–Appellee,**

v.

**MARYLAND NATIONAL BANK, Defendant–Appellee–Cross–Appellant,**

1 East 93 Associates; 36 East 64th Associates; 51st Owners Corp.; 55 West 89th Associates; 107 East 63rd Owners Corp.; 405 East 72nd Owners; 57 West 89th Associates; 342 East 67th Owners Corp., Defendants.

Nos. 817, 982, Dockets 94–7571, 94–7595.

United States Court of Appeals, Second Circuit.

Argued Jan. 19, 1995.

Decided May 11, 1995.

John K. Carroll, New York City (Joseph H. Levie, Mark Holland, Donald E. Griffith, Shannon R. Clark, Rogers & Wells, of counsel), for plaintiff-appellant-cross-appellee.

James A. Moss, New York City (Darlene Fairman, Jonathan S. Lawlor, Herrick, Feinstein, of counsel), for defendant-appellee-cross-appellant.

Before: WALKER, JACOBS, and CALABRESI, Circuit Judges.

JACOBS, Circuit Judge:

In 1988, Maryland National Bank ("MNB") financed a real estate venture for the conversion of several New York City apartment buildings to cooperative or condominium ownership, and sold participations in that $35 million mortgage loan to other banks. A $10 million participation was sold to BAII Banking Corporation ("BAII"), an American subsidiary of Banque Arabe et Internationale D'Investissement ("Banque Arabe"). Banque Arabe, as transferee from BAII, asserts (among other things) that MNB fraudulently failed to disclose that the developer was experiencing a regulatory delay in obtaining necessary approvals for the conversions at the time Banque Arabe made its funding decision. On a motion for summary judgment, the United States District Court for the Southern District of New York (Ward, J.) dismissed Banque Arabe's claim for negligent misrepresentation, among others. We affirm the dismissal of the negligent misrepresentation claim. Following a bench trial on the sole remaining count—common law fraud—Judge Ward determined that Banque Arabe lacked standing as a transferee to assert the fraud claim and that, in any event, Banque Arabe failed to prove scienter or fraudulent intent. Judgment was entered dismissing the complaint. We affirm the dismissal of the fraud claim and the judgment;

however, we do so on the somewhat different ground that, as a matter of law, MNB had no duty under the terms of Banque Arabe's participation to disclose the current regulatory status of the conversions, and that Banque Arabe could not have relied reasonably on MNB for readily available information concerning a disclosed regulatory risk.

## I. Background

A detailed account of the events and transactions in this case is set forth in Judge Ward's opinion granting in part and denying in part MNB's motion for summary judgment, *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 819 F.Supp. 1282 (S.D.N.Y.1993) (*Banque Arabe I*), and in Judge Ward's opinion granting judgment in favor of MNB, *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F.Supp. 1199 (S.D.N.Y. 1994) (*Banque Arabe II*). We iterate only those facts that bear upon and are necessary to resolve the issues raised on appeal.

On June 23, 1988, MNB extended a mortgage loan in the principal amount of $35 million to eight real estate partnerships owned and controlled by Robert K. Marceca (the "Marceca Loan"). The loans were secured by mortgages on eight rent-controlled or rent-stabilized apartment buildings in New York City (the "Marceca Properties"). The proceeds of the loans were to be used to refinance, renovate and convert the buildings to cooperative or condominium ownership. After packaging the loans, MNB arranged the sale of four participation interests, totalling $25 million, to other unaffiliated banks. The fourth and last participation agreement, in the principal amount of $10 million, was sold on September 29, 1988 to BAII, which was then Banque Arabe's American subsidiary (the "Participation Agreement").

MNB had first approached BAII concerning the Marceca Loan in May 1988. The following month, as part of the ensuing arm's length negotiations, MNB gave BAII a projected loan repayment schedule prepared by Marceca. Both parties understood that the

projected principal payments were to be funded out of the proceeds of converting the Marceca Properties to cooperative or condominium ownership. In addition, BAII was aware that the repayment schedule was based on a number of assumptions, including: (a) that the first projected repayment allocable to each building would be made at the time of the closing of the conversion of the building to either cooperative or condominium ownership; and (b) that the closing of the conversion of each building would occur approximately 90 days after an offering plan for the conversion was accepted for filing by New York State's Department of Law ("Department of Law").[1]

In June and July, BAII conducted its own due diligence and credit analysis of the Marceca Loan. Officers of BAII reviewed documents provided by MNB, conducted numerous conversations with MNB, and met individually with Marceca. After completing its due diligence on or about July 13, BAII decided to purchase the $10 million participation interest and so advised MNB. As a condition to its participation, however, BAII required that the Marceca Loan be "cross-collateralized" such that the proceeds from the sale of each apartment in any building would be applied fractionally to all of the eight partnerships. The cross-collateralization negotiations lasted nearly two months. At no time during its due diligence investigation or subsequent negotiations did BAII request any information or documents from MNB, Marceca or the Department of Law concerning the progress in obtaining regulatory approvals for converting the Marceca Properties.

No apartment building may be converted to cooperative ownership in New York State until the conversion plan has been accepted for filing by the Department of Law. As detailed in the district court opinions, the conversion occurs in several steps. First, the sponsor submits a draft proposal, referred to as a "red herring," to which the Department of Law must respond within six months. The Department of Law can accept

---

**1.** The Department of Law for the State of New York is the division of the Attorney General's Office responsible for regulating New York's real estate market, including the conversion of properties to cooperative ownership.

it in the form proposed, reject it outright, or issue a deficiency letter and allow the sponsor an opportunity to cure. Once the Department of Law determines that the conversion plan fully and fairly discloses the nature of the transaction and satisfies other regulatory and statutory requirements, the sponsor is notified that the plan will be accepted upon submission of the final corrected version, called a "black book". The conversion plan does not become final, however, until a designated percentage of a building's occupants enter into subscription agreements to acquire their apartments. Once that percentage is achieved, the sponsor files an amendment with the Department of Law, the conversion is declared effective, and the closing on the conversion may then take place. After the conversion plan is accepted, a minimum of 90 days typically elapses before the closing.

At the time the Marceca Loan closed on June 23, 1988, Marceca had submitted red herrings for two of the eight properties. As of July 13, the date BAII completed its due diligence, the regulatory status of the Marceca Properties was unchanged. On August 9, however, the Department of Law issued a deficiency letter informing Marceca that, because the mortgage agreement afforded MNB the right to approve the terms of the conversion plan, MNB was deemed a "co-sponsor" and should have been identified as such in the red herring's disclosure of sponsorship. This deficiency is referred to hereinafter as "the co-sponsorship issue". Marceca informed MNB of the co-sponsorship issue soon thereafter. On August 18, MNB wrote to the Department of Law explaining that MNB was a lender and was not actively involved with the conversion of the Marceca Properties. In mid-September, Marceca informed MNB that the Department of Law would be considering the co-sponsorship issue at a hearing scheduled for September 22 and that Marceca expected the issue to be resolved quickly. The co-sponsorship issue, however, remained unresolved until January 1989, when MNB agreed to modify the loan documents to eliminate the offending term of the mortgage.

On September 29, 1988, BAII executed the Participation Agreement committing it to purchase $10 million of the Marceca Loan. The Participation Agreement specifically addressed issues of disclosure and due diligence:

The Participant [BAII] acknowledges that it has reviewed all such relevant documents and financial statements as it deemed appropriate or necessary at the time and has had access to all of the records of the Borrowers and of the Lender [MNB] it wished to have, and an opportunity to make such inquiry of the Lender as to the Borrowers' financial conditions and as to the arrangements between the Borrowers and the Lender, and, has, in fact, made inquiry of the Lender in connection therewith to the extent the Participant felt such inquiry necessary or appropriate.

 * * * * * *

*The Participant acknowledges that it has, independently and without reliance upon the Lender and based on such documents and information as the Participant has deemed appropriate or necessary, made its own credit analysis and decision to enter into this Participation Agreement.* The Participant acknowledges that it has not relied upon any investigation performed by the Lender or upon any financial summaries, or credit memoranda or appraisals prepared by or on behalf of the Lender.... *The Participant further acknowledges that it will, independently and without reliance upon the Lender and based on such documents and information as the Participant shall deem appropriate or necessary at the time, continue to make its own credit decisions in taking or not taking action under the Participation Agreement.*

Paras. 1.2 and 5.3 (emphasis added). The Participation Agreement became effective on October 3, 1988 when BAII transferred $10 million to MNB.

Between Banque Arabe's completion of its due diligence review on July 13 and the October 3 transfer of the $10 million, BAII sought no information from anyone about the status of the proposed conversions. On the other hand, neither MNB nor Marceca volunteered information to Banque Arabe about the co-sponsorship issue or delays in obtaining the necessary regulatory approvals. On

August 24, however, MNB sent a revised status report (dated August 17) to those participants who had already funded the project, reporting that the Department of Law had been provided with new sponsor and refinancing information. The district court found that, if BAII had contacted the Department of Law to inquire about the status of the Marceca Properties, BAII would have been: (1) advised whether red herrings had been submitted to the Department of Law; (2) advised whether submitted red herrings had been accepted or rejected; and upon request, (3) provided with copies of red herrings submitted, all revisions and supporting documentation, and any deficiency letters and other correspondence between the Department of Law and the borrowers.

On November 10, 1988, MNB sent BAII an updated repayment schedule for the Marceca Loan, reflecting a four month delay in the principal payments. The November 10 letter attributed the delay to the fact that the Department of Law "failed to complete its review of the Red Herring Offering Plan ... in the statutorily required period of time (six months)." MNB did not tell BAII the reason for the delay, or mention the co-sponsorship issue by name, until January 19, 1989, when MNB sent BAII and the other participants a memorandum announcing that the issue had been resolved.

The New York City real estate market underwent a severe battering during the year 1989. As required by the Participation Agreement, BAII received monthly interest payments from October 3, 1988 to December 31, 1989. However, by reason of the regulatory delays caused by the co-sponsorship issue, as well as the industry's economic slide, the year 1989 ended without any of the Marceca Properties having been converted to tenant ownership. As a result, Marceca defaulted in January 1990. MNB foreclosed on the Marceca Properties in April 1991, and BAII received its pro rata share of the sale proceeds.

Early in 1990, Banque Arabe, BAII's French parent company, decided to transfer the assets of its American subsidiary and dissolve the BAII entity. On May 31, 1990, BAII executed an assignment agreement (the "Assignment") transferring its interests in the Participation Agreement to Banque Arabe.[2] As the party in interest, Banque Arabe commenced this action on October 3, 1990.

The complaint alleged numerous claims for relief against MNB, including: (1) rescission of the Participation Agreement on the ground of common law fraud and deceit; (2) negligent misrepresentation; (3) breach of contract; (4) gross negligence; and (5) breach of fiduciary duty. After Banque Arabe completed discovery, MNB moved for summary judgment. The district court granted summary judgment to MNB on all counts except Banque Arabe's claim for rescission. *See Banque Arabe I*, 819 F.Supp. at 1296. MNB contended that Banque Arabe lacked standing to assert the fraud claim underlying the demand for rescission, because the Assignment did not explicitly transfer tort claims to Banque Arabe. The district court expressly deferred ruling on that question, however, and proceeded to trial.

At the six-day bench trial, Banque Arabe pursued two theories of common law fraud: fraudulent misrepresentation and fraudulent concealment of material information. After trial, Judge Ward concluded that Banque Arabe lacked standing to raise a claim for rescission based upon fraud. Nevertheless, Judge Ward went on to address the merits of Banque Arabe's claim. As to fraudulent misrepresentation, the district court concluded that there was insufficient evidence of an affirmative misrepresentation, and no appeal is taken from that ruling. *See Banque Arabe*

---

**2.** The Assignment provided, in relevant part, that:

> [A]s of May 31, 1990 [BAII] ("Assignor") ... has sold, assigned, transferred, and conveyed, and by these presents does sell, assign, transfer and convey unto [Banque Arabe] ("Assignee"), without recourse to the Assignor, all of [BAII's] rights, title and interest in

> (a) the Participation Agreement ... and (b) [BAII's] participation in a loan made by [MNB] on or about June 23, 1988 to [the Marceca Properties] ... in the original principal amount of $35,000,000 ...,

> Together with all of [BAII's] rights and interest in the transaction described in Paragraphs (a) and (b) above. ...

*II,* 850 F.Supp. at 1216. As to fraudulent concealment, Judge Ward concluded that Banque Arabe failed to prove that MNB had the requisite intent to defraud. In summary, Judge Ward found: (1) that MNB had a duty to disclose the existence of the co-sponsorship issue by reason of its "superior knowledge"; (2) that the co-sponsorship issue was material to BAII's funding decision and relevant to BAII's assessment of Marceca's creditworthiness; (3) that BAII reasonably relied on MNB's failure to disclose the co-sponsorship issue, which, if disclosed, would have been important to BAII's assessment of Marceca's character and ability to convert the properties; (4) that the delay in conversion attributable to the co-sponsorship issue was the proximate cause of the loss that BAII sustained; but (5) that Banque Arabe failed to prove by clear and convincing evidence that MNB intended to defraud BAII. Judge Ward declined to infer fraudulent intent from the fact that every dollar of BAII's participation reduced MNB's financial exposure in the Marceca transaction, and held that MNB's conduct was at worst an "error of judgment".

## II. Discussion

Banque Arabe challenges two crucial rulings: (1) that Banque Arabe lacked standing to pursue a claim of rescission against MNB; and (2) that, in any event, Banque Arabe failed to establish that MNB had the requisite intent to defraud. In addition, Banque Arabe challenges the district court's grant of MNB's motion for summary judgment and the dismissal of Banque Arabe's claim for negligent misrepresentation. On cross-appeal, MNB challenges the following findings: (1) that MNB had a duty to disclose based on its alleged "superior knowledge" of the existence of the co-sponsorship issue; (2) that the co-sponsorship issue was material to Banque Arabe's funding decision and to its assessment of Marceca's creditworthiness; (3) that Banque Arabe reasonably relied on MNB's failure to disclose the co-sponsorship issue; and (4) that the delay in conversion due to the co-sponsorship issue was the proximate cause of the damages sustained by Banque Arabe. Since we hold that Banque Arabe has standing as transferee to seek rescission, we reach the merits of the claim. In so doing, however, we do not address the vexed issue of scienter, because we conclude as a matter of law that MNB had no duty to disclose the co-sponsorship issue and that Banque Arabe could not have reasonably relied on MNB for the disclosure of such information.

### A. *Standing*

▮ The district court held that Banque Arabe lacked standing to assert BAII's tort claims against MNB, because, although the May 31, 1990 Assignment clearly transferred BAII's rights and interests in the Participation Agreement (and therefore any claims grounded in contract), the Assignment did not make an explicit assignment of BAII's claims in tort. We conclude that the Assignment transferred all of BAII's rights to Banque Arabe, tort as well as contract.

▮ Under New York law, the assignment of the right to assert contract claims does not automatically entail the right to assert tort claims arising from that contract. The district court relied principally on *Fox v. Hirschfeld,* 157 A.D. 364, 142 N.Y.S. 261 (1913), for the proposition that the assignment of fraud claims must be explicit. In *Fox,* the First Department held that the plaintiff-assignor had not relinquished his right to pursue claims for rescission or fraudulent misrepresentation notwithstanding his subsequent assignment to his wife of the real property at issue. *Id.* 142 N.Y.S. at 262–63. *Fox* has been construed to mean that, in the absence of an explicit assignment of a cause of action based on fraud, "only the ... assignor may rescind or sue for damages for fraud and deceit; the representations were made to [the assignor] and [the assignor] alone had the right to rely upon them." *Nearpark Realty Corp. v. City Investing Co.,* 112 N.Y.S.2d 816, 817 (N.Y.Sup.Ct.1952). We assume that the doctrine expressed in *Fox* remains the law of New York and is not limited to real estate transactions.

As the district court recognized, New York law does not require specific boilerplate language to accomplish the transfer of causes of action sounding in tort. Rather, "any act or

words are sufficient which 'show an intention of transferring the chose in action to the assignee.' " *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 557 (2d Cir.1976) (quoting *Advance Trading Corp. v. Nydegger & Co.*, 127 N.Y.S.2d 800, 801 (N.Y.Sup.Ct. 1953)). The district court concluded that the recitation transferring all "rights, title and interest" did not reflect a clear intention to transfer to Banque Arabe any tort claims arising out of either the Marceca Loan or the Participation Agreement. The district court therefore went on to consider extrinsic evidence. Officials of both BAII and Banque Arabe testified that they intended to transfer any and all rights, remedies and causes of action as part of the Assignment; however, on a subsequent occasion, when BAII sought to transfer existing litigation claims to an American parent holding company, BAII explicitly referenced such causes of action in the assignment agreement.[3] Judge Ward decided that BAII never "specifically and consciously" agreed to transfer its tort claims.

We conclude that language in the Assignment alone is sufficient to demonstrate BAII's intent to transfer all of their rescission and fraud claims. Contract interpretation is generally a question of law and is subject to *de novo* review. *See Goodheart Clothing Co. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 272 (2d Cir.1992); *Network Publishing Corp. v. Shapiro*, 895 F.2d 97, 99 (2d Cir.1990). A contract is not deemed ambiguous unless "it is reasonably susceptible of more than one interpretation, and a court makes this determination by reference to the contract alone." *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir.1990); *Breed v. Insurance Co. of N. Am.*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280, 1282 (1978).

The May 31, 1990 Assignment transferred "all of [BAII's] rights, title and interest in (a) the Participation Agreement." Standing alone, as the district court considered it, this reference to the contract may be deemed insufficient under *Fox* to transfer claims for rescission or fraud in the inducement.[4] However, the same provision of the Participation Agreement effects the transfer of all rights, title and interest in "(b) [BAII's] participation in [the Marceca Loan]." In order to ascribe meaning, if possible, to all of the contract terms, subparagraph (b) must be read to transfer something more than BAII's rights, title and interest in the Participation Agreement, as referenced in subparagraph (a). *See United States Naval Inst. v. Charter Communications*, 875 F.2d 1044, 1049 (2d Cir.1989) (citing *Spaulding v. Benenati*, 57 N.Y.2d 418, 456 N.Y.S.2d 733, 736, 442 N.E.2d 1244, 1247 (1982)). Elsewhere, the Assignment recites that transfer is being made of "all of [BAII's] rights and interest in the *transaction described* in Paragraphs (a) and (b)." (Emphasis added). We construe this interest in the "transaction" to be broader than an interest in the contract, and we predict that the New York Court of Appeals would deem this language sufficient to effect the assignment of tort claims based on fraud.

In both *Fox* and *Nearpark*, the allocation of rights was a live issue because the question presented was whether the assignor or the assignee was the proper party to bring suit for rescission based on fraud. In this case, BAII drafted the Assignment in anticipation that BAII would be dissolved. The overall design and express commercial purpose of the Assignment transaction thereby reinforces our conclusion that the Assign-

---

3. In an Assignment and Assumption Agreement dated April 10, 1992, BAII transferred all its litigation claims involving the accounts of Will Petroleum to BAII American Holding Corp. The Agreement stated: "The Liquidating Bank [BAII] hereby grants, assigns and conveys unto [BAII American Holding Corp.] all claims, accounts, actions, debts, causes of action and rights to pursue recovery of all sums...." Appellant asserts that the Will Petroleum Assignment was distinguishable because it referenced tort claims that had already been commenced and described the nature of each claim and the parties involved.

Here, by contrast, when BAII executed the Assignment on May 31, 1990, there were no identified or existing claims between BAII and MNB.

4. The language of the assignment agreement transferring the property from Fox to his wife stated: "For value received, I hereby sell, assign, transfer, and set over unto Melinea H. Fox all my *right, title, and interest in and to the within contract.*" *Fox*, 142 N.Y.S. at 262. (Emphasis added).

ment contemplated the transfer of BAII's tort claims to Banque Arabe. A party about to become defunct has little incentive to re-serve transactional rights when transferring its interests to its surviving parent corpora-tion. This conclusion is also consistent with the general trend in New York toward adopt-ing principles of free assignability of claims, including those of fraud. *See* N.Y.Gen. Oblig.Law §§ 13–105 & 13–107 (McKinney 1978); *see also ACLI Int'l Commodity Servs., Inc. v. Banque Populaire Suisse,* 609 F.Supp. 434, 441–42 (S.D.N.Y.1984).

Because we conclude that the Assignment was effective, Banque Arabe is the real party in interest in this appeal. To this point, we have distinguished between BAII and Ban-que Arabe as separate entities. For the remainder of this discussion, however, we will refer to them without distinction as Ban-que Arabe.

## B. *Common Law Fraud*

The district court concluded that Banque Arabe, having established every other ele-ment of its fraudulent concealment claim, failed to prove that MNB had the requisite intent to defraud when it withheld informa-tion concerning the co-sponsorship issue.[5] Banque Arabe argues on appeal that scienter need not always be shown to sustain a claim under New York law for rescission based on fraud. MNB's cross-appeal challenges the district court's conclusion, among others, (1) that MNB's "superior knowledge" created a duty to disclose the existence of the co-spon-sorship issue, and (2) that Banque Arabe reasonably relied on MNB's failure to dis-close the co-sponsorship issue.

To prove common law fraud under New York law, a plaintiff must show that (1) the defendant made a material false repre-sentation, (2) the defendant intended to de-fraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance. *See Keywell Corp. v. Weinstein,* 33 F.3d 159 (2d Cir.1994); *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d

966, 970–71 (2d Cir.1987); *see also Albert Apartment Corp. v. Corbo Co.,* 182 A.D.2d 500, 582 N.Y.S.2d 409, 410 (1992). To estab-lish fraudulent concealment, a plaintiff must also prove that the defendant had a duty to disclose the material information. *See Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 152 (2d Cir.1993); *Gurnee v. Has-brouck,* 267 N.Y. 57, 195 N.E. 683 (1935). Under New York law, each element of a fraud claim must be shown by clear and convincing evidence. *Leucadia, Inc. v. Reli-ance Ins. Co.,* 864 F.2d 964, 971 (2d Cir.1988) (citing *Hutt v. Lumbermens Mut. Casualty Co.,* 95 A.D.2d 255, 466 N.Y.S.2d 28 (1983), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3160, 104 L.Ed.2d 1023 (1989)).

### 1. *Scienter*

On appeal, the parties dispute whether in New York scienter is a necessary element of a contract rescission claim premised on one party's withholding material information from the other. Banque Arabe relies on a line of cases involving "innocent misrepresen-tation." *See, e.g., Seneca Wire & Mfg. Co. v. A.B. Leach & Co.,* 247 N.Y. 1, 159 N.E. 700 (1928). These cases generally hold that equi-table considerations dictate that "an innocent misrepresentation of a material fact permits rescission even though made without the in-tent to deceive." *Stern v. Satra Corp.,* 539 F.2d 1305, 1308 (2d Cir.1976); *see also Sene-ca Wire,* 247 N.Y. at 7–8; *D'Angelo v. Bob Hastings Oldsmobile, Inc.,* 89 A.D.2d 785, 453 N.Y.S.2d 503 (1982), *aff'd,* 59 N.Y.2d 773, 464 N.Y.S.2d 724, 451 N.E.2d 471 (1983); *West Side Fed. Sav. & Loan Ass'n of N.Y. City v. Hirschfeld,* 101 A.D.2d 380, 476 N.Y.S.2d 292, 295 (1984), *appeal denied,* 65 N.Y.2d 605, 493 N.Y.S.2d 1028, 482 N.E.2d 1230 (1985). The district court characterized these "innocent misrepresentation" cases as a variant of the doctrine of mutual mistake: because both parties act under a false as-sumption (transmitted by one party) regard-ing a material issue of fact, rescission or reformation is available without a showing of scienter.

---

5. Banque Arabe does not contest the district court's ruling that it failed to prove its claim of

fraudulent misrepresentation.

The district court treated Banque Arabe's allegations as a case of unilateral mistake, however, and held that Banque Arabe was therefore required to show either scienter or "wrongful conduct" on the part of MNB. *See Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991). Banque Arabe cites *Sheridan Drive–In, Inc. v. State of New York*, 16 A.D.2d 400, 228 N.Y.S.2d 576 (1962), for the proposition that "there is a right of rescission for a unilateral mistake if the mistake was known to the other party at the time of the negotiation of the contract and was not corrected by it." *Id.* 228 N.Y.S.2d at 582. MNB responds that the facts in *Sheridan* describe the very type of "wrongful conduct" that the district court found lacking in this case.

■ The cases we have reviewed do not allow us to predict with confidence how the New York Court of Appeals would reconcile these lines of cases on the facts presented. We decline to guess, and see no reason to certify the question, because (among other reasons) we can affirm the judgment of the district court on grounds pressed in MNB's cross-appeal. We hold that, under the circumstances of this case, MNB had no duty to disclose that the co-sponsorship issue might incrementally delay the approval of the conversion proposal for the Marceca Properties, and that Banque Arabe's reliance on MNB to disclose such information was not reasonable.

### 2. *Materiality*

■ It is difficult to discuss MNB's duty to disclose, and the reasonableness of Banque Arabe's reliance on MNB's non-disclosure, without brief consideration of the undisclosed information—identified by the district court and Banque Arabe as the co-sponsorship issue—and its materiality to Banque Arabe's investment decision.[6] The co-sponsorship issue was ultimately resolved in January 1989 by MNB's agreement to modify the loan documents by relinquishing its right to approve certain aspects of the conversion plan. The problem was therefore remediable, and the remedy lay in the power of

MNB, which had a great stake in the success of the transaction. There is therefore no reason to believe that the co-sponsorship issue would have been permitted to threaten MNB's investment or that of the participant banks.

The materiality and significance of the co-sponsorship issue to Banque Arabe's funding decision has never been obvious. The complaint alleged that concealment of the co-sponsorship issue materially altered the June 1988 projected repayment schedule. Banque Arabe argued that these projections informed its credit analysis and were critical to its decision to fund. The district court, however, disagreed and squarely held that reliance on the June projections was unreasonable. *See Banque Arabe II*, 850 F.Supp. at 1222–23. At trial, Banque Arabe revised its theory of materiality, contending that the co-sponsorship issue was critical to its evaluation of Marceca's "character and capacity." The district court accepted Banque Arabe's altered theory of reliance, but we cannot see how the co-sponsorship issue would materially impact Banque Arabe's assessment of Mr. Marceca.

The co-sponsorship issue involved MNB's role in the conversion process, specifically, MNB's contractual power to approve the terms of the conversion plan. The Department of Law's concern about this arrangement had no moral overtone and shed no light on Marceca's character. Banque Arabe does not allege (nor is there any evidence) that Marceca consciously concealed from anyone that the Department of Law had raised the co-sponsorship issue or had issued a deficiency letter. To the contrary, Marceca informed MNB of both facts shortly after he received the letter. Nor is there any evidence that Marceca attempted to conceal the letter's effects. When asked by MNB, Marceca revised the projected repayment schedule on August 17, 1988 to reflect any delay that may be occasioned by the co-sponsorship issue. Marceca did not directly relay any information to Banque Arabe, but the district court found that this was because

---

**6.** The district court came to the diluted conclusion that had Banque Arabe possessed knowledge of the co-sponsorship issue it "would have been hesitant about funding." *Banque Arabe II*, 850 F.Supp. at 1224.

Marceca did not think that the issue was material to the overall transaction. *Id.* at 1218–19.

Banque Arabe also contends that the co-sponsorship issue impacted its assessment of Marceca's capacity, meaning his "ability to convert" the properties to cooperative ownership based on his extensive experience in a "rather specialized form of property development," his "marketing savvy," and his "negotiating skills." *Id.* at 1224. Evaluation of this skill set, however, would not be affected by a relatively short incremental delay in receiving regulatory approvals: in fact, Marceca's ability to shepherd the conversion proposals through the regulatory process is one reason that he was entrusted with the conversion effort. His ability to resolve the co-sponsorship issue in four months is as much a tribute to his skill as evidence of any impaired capacity.

In short, the co-sponsorship issue was of doubtful materiality, a conclusion that bears upon the two related questions on which we decide this appeal: MNB's duty to disclose and the reasonableness of Banque Arabe's reliance.

### 3. *Duty to Disclose*

■ In business negotiations, an affirmative duty to disclose material information may arise from the need to complete or clarify one party's partial or ambiguous statement, *see Brass*, 987 F.2d at 150 (citing *Junius Constr. Corp. v. Cohen*, 257 N.Y. 393, 400 (1931)), or from a fiduciary or confidential relationship between the parties, *see id.* (citing *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 45 (2d Cir.1991)). Such a duty may also arise—as claimed here by Banque Arabe—where: (1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge. *See id.* (citing *Aaron Ferer & Sons Ltd. v. Chase Manhattan*

*Bank, N.A.*, 731 F.2d 112, 123 (2d Cir.1984)); *accord Young v. Keith*, 112 A.D.2d 625, 627, 492 N.Y.S.2d 489 (1985).

■ Of course, disclosure obligations may be modified by contract. *See, e.g. Grumman Allied Indus. Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 734–35 (2d Cir.1984) (citing *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959)). In this case, Banque Arabe expressly recited in the Participation Agreement that it was not relying on MNB for information relevant to its independent credit analysis and funding decision, and would not so rely in the future.[7] "[W]here a party specifically disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action for fraud, assert it was fraudulently induced to enter into the contract by the very representation it has disclaimed." *Id.* The Participation Agreement therefore operates as a waiver absolving MNB of responsibility to make affirmative disclosures concerning the financial risks of the Marceca Loan. *See Banco Espanol de Credito v. Security Pac. Nat'l Bank*, 973 F.2d 51, 53, 56 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993). As the district court noted, however, even such an express waiver or disclaimer "will not be given effect where the facts are peculiarly within the knowledge of the party invoking it." *Stambovsky v. Ackley*, 169 A.D.2d 254, 572 N.Y.S.2d 672, 677 (1991) (citing *Danann*, 5 N.Y.2d at 322, 184 N.Y.S.2d 599, 157 N.E.2d 597).

■ In this light, the district court held that MNB's "superior knowledge" created a duty to disclose the co-sponsorship issue to the extent that such information "was not readily available to [Banque Arabe] and was peculiarly within MNB's knowledge." *Banque Arabe II*, 850 F.Supp. at 1217. In order to recover on that ground, however, Banque Arabe was required to show that MNB knew that Banque Arabe was acting in reliance on mistaken knowledge regarding that issue. *See Frigitemp Corp. v. Financial Dynamics*

---

7. In pertinent part, the Participation agreement recited that Banque Arabe had "independently and without reliance upon [MNB] ... made its own credit analysis and decision to enter into this Participation Agreement." Banque Arabe further acknowledged it would "independently and without reliance upon [MNB] ... continue to make its own credit decisions in taking or not taking action under the Participation Agreement."

*Fund, Inc.,* 524 F.2d 275, 283 (2d Cir.1975). In the context of this case, Banque Arabe cannot make that showing.

MNB was a participant in the Marceca Loan as well as the loan syndicator, and therefore had every incentive to promote the success of the real estate venture. In so doing, MNB would necessarily keep its eye on the same set of factors and risks that the other participant banks would consider in evaluating the financial viability of the conversion project. We therefore cannot conclude that MNB "knew" that co-sponsorship-caused delay was critical to Banque Arabe unless we first conclude that MNB also deemed that issue critical to its own investment in the Marceca Loan. The record is uncontested, however, that MNB and Marceca considered the co-sponsorship issue unimportant, and did not expect its resolution to materially affect the timing of the pay-down schedule. *Banque Arabe II,* 850 F.Supp. at 1218–19. At any point after the issuance of the deficiency letter in August 1988, MNB had the power to cure the defect simply by deleting one paragraph from the conversion proposal, as it in fact did in January 1989. Although regulatory delay will sooner or later threaten this kind of real estate transaction, MNB could not have viewed with alarm a situation it could cure at will, and cannot be deemed to have "known" that Banque Arabe would attach so much greater importance to the delay.

Banque Arabe contends that MNB's economic interests were not in fact aligned with those of Banque Arabe, because MNB was the lead syndicating bank for the Marceca Loan. Thus Banque Arabe charges that MNB adopted a strategy to fraudulently induce Banque Arabe to participate in order to lay off $10 million of MNB's financial exposure (generating significant fee income at the same time). However, Banque Arabe does not explain why, if MNB was alarmed about the co-sponsorship issue, it would proceed to lay off part of its risk on an unsuspecting participant—and suffer the loss of its own remaining investment—rather than simply cure the deficiency in the way it ultimately

did. In any event, this sinister explanation of MNB's conduct is foreclosed by the district court's finding that MNB lacked scienter, and by the district court's refusal to infer any wrongdoing from the fact that MNB's loss was reduced by Banque Arabe's participation.[8] *See id.* at 1226.

In summary, although the district court found that MNB had a duty to disclose the co-sponsorship issue, there is no basis in the record for concluding that MNB knew that Banque Arabe was either relying on MNB for that information or acting on the basis of mistaken information. Such knowledge is a prerequisite to a duty to disclose based upon superior knowledge and is therefore an indispensable element of Banque Arabe's claim. *See Brass,* 987 F.2d at 150.

### 4. *Reasonable Reliance*

■ To prevail on its theory of fraudulent concealment, Banque Arabe was also required to establish that it actually relied on the disclosure or lack thereof, and that such reliance was reasonable or justifiable. *See e.g., Harris v. Camilleri,* 77 A.D.2d 861, 431 N.Y.S.2d 65, 68 (1980). Since the Participation Agreement expressly recited that Banque Arabe would not rely on information from MNB in making its "credit decisions" or in "taking or not taking action under the Participation Agreement," Banque Arabe could only rely on MNB to disclose information that was "peculiarly within the knowledge" of MNB. *Stambovsky,* 572 N.Y.S.2d at 677; *see also Royal American Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1016 (2d Cir.1989) ("Where the representation relates to matters that are not peculiarly within the other party's knowledge and both parties have available the means of ascertaining the truth, New York courts have held that the complaining party should have discovered the facts and that any reliance under such circumstances therefore would be unjustifiable."); *Mallis v. Bankers Trust,* 615 F.2d 68, 80–81 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). We conclude that Banque Arabe could not have reasonably relied on MNB to

---

**8.** The district court also found that MNB did not exhibit a conscious disregard of the truth when it

failed to disclose the co-sponsorship issue. *Banque Arabe II,* 850 F.Supp. at 1226.

disclose the co-sponsorship issue because the prospect of an incremental delay in the regulatory approvals needed for converting those properties was a known and disclosed risk, and because information regarding the status of the conversion proposal for the Marceca Properties was readily accessible to any interested party who cared to make inquiry.

The deficiency letter was not a bolt from the blue, such as news that one of the apartment buildings under conversion had burned down, or that Marceca had died or filed for bankruptcy. The letter did not reject the conversion plan outright; it merely augured some lengthening of a regulatory process that would in no event be short and could not be expected to proceed without some active oversight or input by the Department of Law. The co-sponsorship issue, which was not by nature intractable or fatal, and was in fact disposed of simply by the renunciation of a non-essential contract provision, did not disrupt the calculus of known risks.

The district court treats the co-sponsorship issue specifically, and the delay attendant to that issue, as an unanticipated event. While no one apparently anticipated that the Department of Law would fix upon that specific issue, delay caused by regulatory oversight was a known risk. The regulatory process for converting apartments to cooperative ownership was disclosed by MNB and understood by Banque Arabe. Maurice Nahn, the Vice President responsible for conducting Banque Arabe's credit analysis, testified that he was fully aware of the mechanics of the regulatory procedures required to obtain approvals for conversion from the Department of Law. Nahn further testified that he had a basic understanding of the time it would take to obtain the approvals, and appreciated the risk that the Department of Law might issue a deficiency letter and that the sponsor would then be given time to respond and to cure the deficiency. At his deposition, Nahn stated that he was aware in June 1988 that obtaining the required regulatory approvals

from the Department of Law was a "lengthy process." In describing the June 1988 projections, Nahn stated that they were premised on an aggressive estimate that the conversion of each building would take approximately nine months from the submission of the red herring to the closing.

No one could reasonably assume that the regulatory scrutiny of this complex transaction would be quick and free from incident, but only Banque Arabe could gauge how much regulatory delay or risk it could tolerate. Ultimately, Banque Arabe's position is untenable because the more it argues that the current regulatory status of the conversion plans was crucial to its funding decision, the more unaccountable becomes its failure to inquire about it.

Information concerning the co-sponsorship issue was not "peculiarly within the knowledge" of MNB, *see Stambovsky*, 572 N.Y.S.2d at 677, because it was readily available to Banque Arabe or any interested party who cared to ask. The district court found that had Banque Arabe contacted the Department of Law and inquired about the status of the Marceca Properties, the Department of Law

> (a) would have advised [Banque Arabe] whether red herrings had been submitted and for which buildings; (b) advised [Banque Arabe] whether red herrings submitted to the Department of Law had been accepted or rejected; and (c) made available for review and copying by [Banque Arabe] the red herrings submitted by the Marceca borrowers, any revised versions thereof, any supporting documentation submitted by the Marceca borrowers to the Department of Law, and *any deficiency letters* and other correspondence between the Department of Law and the borrowers or their counsel and the Department of Law concerning any plans that had been rejected.

*See Banque Arabe II*, 850 F.Supp. at 1204 (emphasis added).[9] The deficiency letter

---

9. In discussing the scope of MNB's duty to disclose, the district court stated the following:

Clearly, MNB had to relay to [Banque Arabe] the existence of the co-sponsorship issue. [Banque Arabe] could not have learned of this

information from the Department of Law, which does not comment publicly on a matter referred to the Enforcement Division. Even more definitely, [Banque Arabe] could not have

would have told Banque Arabe—or alerted it to—all it needed to know. Banque Arabe also had private channels for inquiry concerning the status of the regulatory approvals. As part of Banque Arabe's due diligence, Nahn participated in meetings and conference calls with representatives of MNB and met individually with Marceca to discuss the transaction. Banque Arabe therefore had direct or indirect access to the people most familiar with the building conversions and the current status of regulatory approvals. At no time, however, during its due diligence investigation or subsequent negotiations did Banque Arabe request any information or documents from MNB or Marceca concerning the status of the conversion or the Marceca Properties.

In short, incremental regulatory delay was a known risk, the particulars of which at any given time Banque Arabe could have learned by inquiry from any of several sources. It was therefore unreasonable for Banque Arabe to rely on MNB to intuit Banque Arabe's sensitivity on this issue and volunteer information that Banque Arabe was not seeking. *See, e.g., Grumman*, 748 F.2d at 739 (rejecting plaintiff's claim of a duty of disclosure because plaintiff had access to the alleged omitted information).

## C. *Negligent Misrepresentation*

Banque Arabe alleges that the district court improperly dismissed its claim of negligent misrepresentation.

■■ Under New York law, a plaintiff may not recover for negligent misrepresentation in the absence of a special relationship of trust or confidence between the parties. *See Congress Financial Corp. v. John Morrell & Co.*, 790 F.Supp. 459, 474 (S.D.N.Y.1992); *accord White v. Guarente*, 43 N.Y.2d 356, 363, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977); *Coolite Corp. v. American Cyanamid Co.*, 52 A.D.2d 486, 384 N.Y.S.2d 808, 811 (1976).

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We review a district court's grant of summary judgment *de novo*, viewing the evidence "in a light most favorable to ... the non-moving party, and draw[ing] all reasonable inferences in his favor." *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993).

■■ Generally, banking relationships are not viewed as special relationships giving rise to a heightened duty of care. *See Aaron Ferer*, 731 F.2d at 122 (stating that the usual relationship of a bank and its customer is not a fiduciary one, but simply that of debtor and creditor). In the case of arm's length negotiations or transactions between sophisticated financial institutions, no extra-contractual duty of disclosure exists. *See Banco Espanol de Credito v. Security Pac. Nat'l Bank*, 763 F.Supp. 36, 44 (S.D.N.Y.1991); *see also Banco Espanol*, 973 F.2d at 56. This same principle applies to loan participation agreements, in which there is deemed to be no fiduciary relationship unless expressly and unequivocally created by contract. *See Banco Espanol*, 763 F.Supp. at 45; *see also First Citizens Fed.Sav. & Loan Ass'n v. Worthen Bank & Trust Co.*, 919 F.2d 510, 513–14 (9th Cir.1990). Here, Banque Arabe and MNB engaged in arm's length negotiations and the Participation Agreement explicitly disclaims any reliance by Banque Arabe on MNB for information regarding its credit analysis and funding decision. Furthermore, as discussed above, access to the supposedly concealed information was in fact available to Banque Arabe in the course of its due diligence, and thereafter.

Because no "special relationship" exists between Banque Arabe and MNB, the district court properly dismissed Banque Arabe's claim for negligent misrepresentation.

---

received this information through communication with Marceca.
*Banque Arabe II*, 850 F.Supp. at 1216–17. We find this conclusion to be clearly erroneous in light of the district court's finding of fact that

Banque Arabe could have received a copy of the deficiency letter directly from the Department of Law detailing the objection to MNB's co-sponsorship of and participation in the conversion of the Marceca Properties.

## Conclusion

For the foregoing reasons, we affirm the district court's judgment.