**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

SKYE MINERAL INVESTORS, LLC and )
CLARITY COPPER, LLC, directly and derivatively )
on behalf of SKYE MINERAL PARTNERS, LLC, )
                                             )
                      Plaintiffs, )
                                             )
       v. )
                                               )  **C.A. No. 2018-0059-JRS**
DXS CAPITAL (U.S.) LIMITED, PACNET )
CAPITAL (U.S.) LIMITED, MARSHALL )
COOPER, SANJIV NORONHA, WATERLOO )
STREET LIMITED, LIPPO CHINA RESOURCES )
LTD., MICHAEL RIADY, STEPHEN RIADY, )
                                             )
                    Defendants, )
                                             )
SKYE MINERAL PARTNERS, LLC, )
                                             )
                  Nominal Defendant. )
_____ )
DXS CAPITAL (U.S.) LIMITED, PACNET )
CAPITAL (U.S.) LIMITED, and WATERLOO )
STREET LIMITED, directly and derivatively on )
behalf of SKYE MINERAL PARTNERS, LLC, )
                                             )
                  Counterclaim Plaintiffs, )
                                             )
       v. )
                                               )
SKYE MINERAL INVESTORS, LLC and )
CLARITY COOPER, LLC, )
                                             )
                  Counterclaim Defendants, )
                                             )
SKYE MINERAL PARTNERS, LLC, )
                                             )
                  Nominal Defendant. )

DXS CAPITAL (U.S.) LIMITED, PACNET )
CAPITAL (U.S.) LIMITED, and WATERLOO )
STREET LIMITED, directly and derivatively on )
behalf of SKYE MINERAL PARTNERS, LLC, )
   )
       Third Party Plaintiffs, )
   )
     v. )
   )
DAVID J. RICHARDS and CLINTON W. )
WALKER, )
   )
       Third Party Defendants, )
   )
SKYE MINERAL PARTNERS, LLC, )
   )
       Nominal Defendant. )

# MEMORANDUM OPINION

Date Submitted:  April 13, 2021
Date Decided:  July 28, 2021

Rudolf Koch, Esquire, Kevin M. Gallagher, Esquire and Daniel Kaprow, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Jason Cyrulnik, Esquire, Edward Normand, Esquire and Paul Fattaruso, Esquire of Cyrulnik Fattaruso LLP, New York, New York, Attorneys for Plaintiffs, Counterclaim-Defendants and Third-Party Defendants.

Thomas W. Briggs, Jr., Esquire and Miranda N. Gilbert, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Pedro A. Jimenez, Esquire, Kevin C. Logue, Esquire, Kevin P. Broughel, Esquire, Nicholas Bassett, Esquire, Katherine K. Solomon, Esquire, Katherine Rookard, Esquire of Paul Hastings LLP, New York, New York, Attorneys for Counterclaim-Plaintiffs and Third-Party Plaintiffs.

**SLIGHTS, Vice Chancellor**

The Greek philosopher Pythagoras is said to be the first to observe that "there are two sides to every question."[1]  Last year, this Court decided a motion to dismiss brought by the majority members of a Delaware limited liability company, Skye Mineral Partners, LLC ("SMP" or the "Company"), alleging that minority members orchestrated a scheme wrongfully to divest SMP of its lone asset, a wholly-owned operating subsidiary, CS Mining, LLC ("CSM").[2]  When the Court determined that certain of SMP's claims would survive, the minority members, Defendants, DXS Capital (U.S.) Limited ("DXS"), PacNet Capital (U.S.) Limited ("PacNet") and Waterloo Street Limited ("Waterloo" and, together with DXS and PacNet, "Counterclaim-Plaintiffs"), brought counterclaims (the "Counterclaims") to state their side of the story.  This decision addresses the motion to dismiss those Counterclaims.

Counterclaim-Plaintiffs allege that Skye Mineral Investors, LLC ("SMI") and Clarity Copper ("CC"), along with their controllers, David J. Richards and Clinton W. Walker (together with SMI, CC and Richards, "Counterclaim-Defendants"), wielded their economic, operational and voting control of both SMP and its operating subsidiary, CSM, unlawfully to advance their own interests over

---

[1] *Pythagorean Theorem*, Encyclopedia Britannica (last visited July 25, 2021) www.britannica.com/science/pythagorean-theorem.

[2] *Skye Mineral Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544 (Del. Ch. Feb. 24, 2020).

those of SMP and its minority owners to whom they owed fiduciary duties. In broad strokes, the Counterclaims cast Counterclaim-Defendants as faithless fiduciaries who engaged in a series of unlawful acts to preserve the first-lien creditor status of non-party, David Richards LLC d/b/a Western US Mineral Investors, LLC ("Richards LLC"), with the goal of driving CSM into bankruptcy. Once CSM entered bankruptcy, the plan was for Richards LLC to leverage its creditor rights to divest DXS and PacNet of their equity interests in SMP.

The Counterclaims detail wrongful behavior dating back as far as 2013, asserting direct and derivative claims against all Counterclaim-Defendants for breach of their fiduciary duties, aiding and abetting and civil conspiracy. Counterclaim-Plaintiffs also assert claims for tortious interference against Richards and Walker for their role in allegedly subverting Waterloo's claim to CSM's assets as creditor in favor of Richards LLC. Finally, Counterclaim-Plaintiffs bring a breach of contract claim under SMP's operative constitutive agreement, the Third Amended and Restated Limited Liability Company Agreement (the "SMP Agreement"), against SMI and CC for unduly engaging in "Related Party" transactions. All Counterclaim-Defendants have moved to dismiss the Counterclaims.

At the threshold, Counterclaim-Defendants argue Counterclaim-Plaintiffs' claims are time-barred under the doctrine of laches. They further argue, under Chancery Rule 12(b)(6), that Counterclaim-Plaintiffs fail to state legally viable

2

claims. Finally, under Chancery Rule 23.1, Counterclaim-Defendants argue the derivative claims fail because Counterclaim-Plaintiffs do not adequately plead demand futility.

For reasons explained below, as was the case with the motion to dismiss Counterclaim-Defendants' claims, the result of the effort to dismiss the Counterclaims is "a mixed bag."[3] The bulk of the Counterclaims are time-barred, except Waterloo's claim for tortious interference and those claims arising from Richards and Walker's alleged attempt during bankruptcy to force a settlement between CSM and Richards LLC. Thus, Counterclaim-Plaintiffs' claim for breach of contract is dismissed in its entirety, while their claims for breach of fiduciary duty, aiding and abetting and civil conspiracy are preserved only to the extent they rely on the alleged forced settlement. In addition, Waterloo fails to state a claim for tortious interference except with respect to one of the discrete alleged acts, while PacNet and DXS's claims for breach of fiduciary duty, aiding and abetting and civil conspiracy survive. As for the derivative claims brought on behalf of SMP, Counterclaim-Plaintiffs have well pled demand futility; therefore, the motion to dismiss under Chancery Rule 23.1 must be denied. My reasoning follows.

---

[3] *Id.* at *1.

## I. BACKGROUND

The facts are drawn from the pleadings, documents incorporated into the pleadings by reference and matters of which the Court may take judicial notice.[4]

### A. The Parties

Counterclaim-Plaintiff, DXS, is a Delaware limited liability company.[5] DXS is a member of SMP.[6]

Counterclaim-Plaintiff, PacNet, is a Delaware limited liability company.[7] PacNet is a member of SMP and was an unsecured creditor of CSM, having extended an unsecured loan in the amount of approximately $5 million to CSM in early 2016 to help CSM address its liquidity issues.[8] Under the SMP Agreement, PacNet, along with DXS, together were entitled to designate one member to SMP's three-member Board of Managers (the "Board").[9]

---

[4] *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 612–13 (Del. 1996).

[5] Defs.' Answering and Affirmative Defenses to Pls.' Second Am. Verified Compl. and Defs.' Verified Countercls. and Third-Party Compl. (D.I. 109) ("Countercl.") ¶ 6.

[6] *Id.*

[7] Countercl. ¶ 7.

[8] *Id.*

[9] D.I. 60, Ex. 1 ("SMP Agreement"); *see also* Countercl. ¶¶ 129–36 (incorporating by reference the SMP Agreement).  The SMP Agreement is governed by Delaware law.

Counterclaim-Plaintiff, Waterloo, is a British Virgin Islands limited company.[10] Waterloo was a secured creditor of CSM through its acquisition of a loan made to CSM by Noble Americas Corporation ("Noble").[11]

Counterclaim-Defendant, SMI, is an Ohio limited liability company.[12] SMI is a member of SMP with the right under the SMP Agreement to appoint one member to the Board.[13] Counterclaim-Defendant, Richards, is a citizen of Ohio and a member of the Board (as SMI's designee) and CSM's Board of Managers.[14] At all relevant times, Richards controlled SMI and was an investor in Richards LLC.[15] He was also a member of the Board of Managers of Richards LLC.[16]

Counterclaim-Defendant, CC, is a Delaware limited liability company.[17] CC is a member of SMP and was also an investor in Richards LLC.[18] Like SMI, CC had a right to appoint one member to SMP's Board. Its designee was

---

[10] Countercl. ¶ 8.

[11] *Id.*

[12] Countercl. ¶ 10.

[13] *Id.*

[14] Countercl. ¶ 9.

[15] *Id.*

[16] *Id.*

[17] Countercl. ¶ 12.

[18] *Id.*

Counterclaim-Defendant, Walker, who was also on CSM's Board of Managers.[19] At all relevant times, Walker controlled CC, was an investor in Richards LLC, and was also a member of the Board of Managers of Richards LLC.[20]

## B. The Entities' Formation

In 2011, Richards and Walker formed SMP and CSM after purchasing CSM's assets out of a prior bankruptcy.[21] SMP's sole asset was a 99% ownership stake in CSM, a Delaware limited liability company.[22] Prior to a court-supervised sale process in August 2017, CSM owned a copper mining operation in Utah where it sought to exploit valuable mineral deposits that, if extracted and processed, were potentially worth $600 million.[23]

SMP has four members: SMI, CC, DXS and PacNet.[24] SMI and CC controlled SMP through their majority ownership of SMP's Class A equity and its

---

[19] Countercl. ¶ 11.

[20] *Id.*

[21] Countercl. ¶ 13.

[22] Countercl. ¶ 14.

[23] *Id.*

[24] Countercl. ¶ 15.

fully diluted equity. DXS and PacNet held minority ownership positions in SMP.[25]

As noted, Richards and Walker control SMI and CC, respectively.[26]

Under the SMP Agreement, SMP's managers' fiduciary duties are analogous to those owed by directors of Delaware corporations.[27] With that said, the SMP Agreement makes clear that managers "may have other business interests."[28] As for the members of SMP, the SMP Agreement disclaims fiduciary duties "insofar as making other investment opportunities available to the Company or to the other Members," and allows SMP's members to give or withhold, condition or delay their "votes, approvals or consents" in their "sole and absolute discretion."[29] Section 3.5 of the SMP Agreement authorizes the Board to cause the Company to borrow from the members, provided other members had a right to participate in the loan on a *pro rata* basis and the Board authorizes the loan.[30]

Richards, Walker and CC were all investors in Richards, LLC, which held as its sole investment a senior lien over substantially all of CSM's assets, the result of

---

[25] Countercl. ¶ 16.

[26] Countercl. ¶ 15.

[27] SMP Agreement § 5.1.

[28] *Id.* § 5.1(h).

[29] *Id.* §§ 4.3, 4.6.

[30] *Id.* § 3.5.

an approximately $20.5 million loan made between August 2012 and July 2014 to fund CSM's operations and capital investments.[31] As "Minority Managers" under the First Amended Limited Liability Company Agreement of Richards LLC (the "Richards LLC Agreement"), Richards and Walker had final say over key decisions of its Board of Managers.[32] For example, under Section 5.4 of the Richards LLC Agreement, Richards LLC could not declare a default on the Richards LLC loan to CSM, except under limited circumstances, and could not pursue collection or foreclosure on Richard LLC's loan to CSM without Richards and Walker's approvals.[33]

## C. The Noble Loan

In 2014, Noble made a loan to CSM as part of CSM's effort to raise approximately $45 million to build a new ore processing facility known as "Phase II."[34] Noble agreed to loan $15 million initially, then another $15 million if and when CSM secured $15 million in matching equity financing (the "Noble Loan").[35] The agreement memorializing the Noble Loan is dated August 12, 2014

---

[31] Countercl. ¶¶ 9, 11–12, 21, 23–24.

[32] Countercl. ¶ 22.

[33] *Id.*

[34] Countercl. ¶¶ 25, 28, 30.

[35] Countercl. ¶ 30.

(the "Noble Loan Agreement").[36]   The Noble Loan and the proposed equity financing together would raise the $45 million projected to be needed for Phase II. The Noble Loan Agreement required that: (i) CSM complete the new processing facility by November 30, 2015; and (ii) CSM begin making amortization payments on the Noble Loan starting in October 2015.[37]

As further inducement for the Noble Loan, Richards LLC agreed to subordinate the liens it held against CSM's Phase II assets, allowing Noble to step into the senior lien position on those assets.[38]   Noble agreed, in turn, that Richards LLC would continue to enjoy a senior lien on CSM's other assets until Noble advanced the full $30 million to CSM, at which time Richards LLC would convert the full amount of its loan into equity of SMP and release all of its liens on CSM's assets.[39]   The terms and obligations of these agreements were detailed in the Noble Loan Agreement and the Intercreditor Agreement between CSM, Richards LLC and Noble (the "Intercreditor Agreement"), dated August 12, 2014.[40]

---

[36] Countercl. ¶ 29.

[37] Countercl. ¶ 38.

[38] Countercl. ¶ 28.

[39] *Id.*

[40] Countercl., Ex. 1.

According to the Counterclaims, as soon as the ink was dry on the Noble Loan documents, Counterclaim-Defendants commenced their scheme to cause CSM to default under the Noble Loan, thereby triggering a chain reaction where Richards LLC would avoid the conversion of the Richards LLC Loan to SMP equity, which, in turn, allowed Richards LLC to avoid the full consequences if CSM were to fail by preserving its rights as creditor.[41] Counterclaim-Defendants implemented their scheme by:

- Blocking CSM from raising the additional capital (~$10 million) necessary for CSM to keep the Phase II project on track, thereby increasing the likelihood of default under the Noble Loan;[42]
- Secretly negotiating and forcing CSM to execute a side agreement with Richards LLC providing that CSM would not be permitted to draw down the full $30 million of the Noble Loan (which would cause the Richards LLC Loan to convert to equity) without Richards LLC's prior consent, and concealing that secret agreement from SMP's other members and managers;[43]
- Advancing their own interests over their fiduciary obligations to SMP by revoking their consent to a December 2015 amendment to the Noble Loan Agreement that would have remedied a default thereunder and paved the way for the Richards LLC Loan to convert to equity;[44]
- Inducing PacNet to provide approximately $5 million of unsecured funding to keep CSM afloat by representing that Counterclaim-Defendants would work in good faith on a comprehensive, long-term funding solution for SMP and CSM, all while harboring their secret agreement to ensure that the Richards

---

[41] Countercl. ¶¶ 4, 35, 39–75.

[42] Countercl. ¶¶ 4(a), 37.

[43] Countercl. ¶¶ 4(b), 48.

[44] Countercl. ¶¶ 4(c), 39–47.

10

LLC Loan would never convert to SMP equity, thereby ensuring CSM's insolvency;[45]

- Executing consents and exercising their managerial influence over Richards LLC to permit Richards LLC to begin foreclosure proceedings against CSM's assets and refusing to take any actions (as fiduciaries of SMP and CSM) to halt or oppose such proceedings;[46]

- Opposing the attempts of DXS and PacNet to appoint an independent receiver for CSM;[47] and

- Forcing CSM to seek the Utah bankruptcy court's approval of a self-serving "settlement" with Richards LLC, which would have allowed Richards and Walker to acquire CSM's assets on the cheap and which harmed Counterclaim-Plaintiffs by chilling third-party bidding for CSM's assets.[48]

Counterclaim-Defendants' scheme ultimately drove CSM into bankruptcy.[49]

The petition for protection under Chapter 11 of the United States Bankruptcy Code was brought in the United States Bankruptcy Court for the District of Utah (the "CSM Bankruptcy Case").[50] Counterclaim-Plaintiffs allege that they, along with SMP, suffered significant damages as a result of these actions and seek to recover those damages in the Counterclaims.[51]

---

[45] Countercl. ¶¶ 4(d), 59–62.

[46] Countercl. ¶¶ 65–67.

[47] Countercl. ¶¶ 69–70.

[48] Countercl. ¶¶ 71–76.

[49] Countercl. ¶ 4(f).

[50] *Id.*

[51] Countercl. ¶¶ 110, 117, 122, 128, 136, 142.

11

## D. Procedural History

On July 21, 2016, Waterloo and PacNet commenced an adversary proceeding in the CSM Bankruptcy Case (the "Adversary Proceeding"), asserting, among other things, that Richards, Walker, SMI and CC had tortiously interfered with Waterloo's contractual or economic relationship with CSM.[52]  In December 2017, the Utah Bankruptcy Court denied motions to dismiss the Adversary Proceeding.[53]

In January 2018, Counterclaim-Defendants, SMI and CC, commenced this action and simultaneously filed nearly identical counterclaims in the Adversary Proceeding.[54]  Counterclaim-Defendants also moved to stay the Adversary Proceeding, which prompted the parties to stand down voluntarily in the CSM Bankruptcy Case to avoid duplicative litigation.[55]

Meanwhile, on April 22, 2019, Counterclaim-Defendants filed their Second Amended Complaint (the "Complaint"), which Counterclaim-Plaintiffs promptly moved to dismiss.[56]  In December 2019, while the motion to dismiss the Complaint was pending in this Court, the Utah Bankruptcy Court issued an order to show cause

---

[52] Countercl. ¶ 77 (citing C.A. No. 16-ap-2118, D.I. 1).

[53] Countercl. ¶ 78 (citing C.A. No. 16-ap-2118, D.I. 69).

[54] D.I. 1; Countercl. ¶ 78.

[55] Countercl. ¶ 78.

[56] D.I. 52, 59, 60.

why the Adversary Proceeding should not be dismissed given that it had remained largely inactive since mid-2018.[57]  In response, all parties agreed the Utah Bankruptcy Court should not take action until this Court ruled on the motion to dismiss the Complaint.[58]

On February 24, 2020, this Court issued its ruling denying in part and granting in part the motions to dismiss the Complaint.[59]  Counterclaim-Plaintiffs filed their Answer, Affirmative Defenses, Counterclaims and Third-Party Complaint on March 31, 2020.[60]  The Counterclaims comprise six Counts.[61]

Count I asserts Richards and Walker are liable for tortious interference with contract by:

- Executing a "secret side agreement" between Richards LLC and CSM, giving Richards LLC consent rights that it could withhold until the accrual of certain events of default under the Noble Loan;[62]
- Delaying and obstructing all efforts to provide necessary capital to CSM so that CSM would default under the Noble Loan in an effort to relieve Richards LLC of its obligation to convert the Richards LLC Loan to equity and release all liens on CSM's assets;[63] and

---

[57] Countercl. ¶ 80.

[58] *Id.*

[59] Countercl. ¶ 81.

[60] *Id.*

[61] Countercl. ¶¶ 91–142.

[62] Countercl. ¶ 48.

[63] Countercl. ¶ 106.

13

- Withdrawing (in their capacity as CSM's board members) their consent to the amendment to the Noble Loan that would have extended the deadline to complete construction of a new processing facility and the deadline to begin repaying the Noble Loan as of February 3, 2016.[64]

Count II asserts Richards and Walker are liable for breach of fiduciary duty by:

- Entering into the "secret side agreement";[65]
- Managing CSM and SMP "in a manner designed to create an event of default under the Noble Loan";[66]
- Abusing their control position in SMP "to protect the majority ownership stake in SMP held by SMI and [CC] and protect their economic stake in" Richards LLC and its loan;[67] and
- Attempting to force a settlement between CSM and Richards LLC "designed to give the Counterclaim-Defendants ownership of CSM's assets and extinguishing SMP's economic interest in CSM."[68]

Count III asserts all Counterclaim-Defendants are liable for aiding and abetting based entirely on the acts underlying Count II.[69] Likewise, Count IV asserts all Counterclaim-Defendants are liable for civil conspiracy based entirely on those acts alleged in Counterclaim-Plaintiffs' breach of fiduciary duty and tortious

---

[64] Countercl. ¶¶ 53, 63, 108.

[65] Countercl. ¶ 115(b)

[66] Countercl. ¶ 115(c)

[67] Countercl. ¶ 115(a).

[68] Countercl. ¶¶ 73–75, 115(d).

[69] *See* Countercl. ¶¶ 118–22.

14

interference claims.[70]  Count V asserts a claim for breach of the SMP Agreement

against SMI and CC based on the "secret side agreement."[71]

Count VI asserts SMI and CC are liable for breach of fiduciary duty by:

- Blocking "any financing or investment proposal that would take away from the Counterclaim-Defendants['] economic and managerial control of SMP";[72]
- Concealing the "secret amendment" of Richards LLC's loan;[73]
- "[P]ermitting Richards and Walker to execute consents to permit" Richards LLC to "begin foreclosure proceedings" and "then failing to take any steps" to prevent Richards LLC "from initiating foreclosure proceedings";[74] and
- Blocking "the Delaware receivership action that would have appointed a disinterested receiver" to address Richards LLC's loan and "imminent foreclosure of same."[75]

On July 31, 2020, the Utah Bankruptcy Court issued a ruling granting the

motion to dismiss the Adversary Proceeding for lack of subject matter jurisdiction.[76]

In its dismissal order, the Utah Bankruptcy Court specifically stated, "[t]his is not

---

[70] Countercl. ¶ 126.

[71] Countercl. ¶ 133.

[72] Countercl. ¶ 53.

[73] Countercl. ¶¶ 140(a)–(b).

[74] Countercl. ¶ 140(c).

[75] Countercl. ¶ 140(d).

[76] Countercl. ¶ 83.

an adjudication on the merits and is without prejudice to the Counterclaim-Defendants' ability to refile the litigation elsewhere."[77]

Counterclaim-Defendants filed their motion to dismiss the Counterclaims on December 29, 2020. After briefing, oral argument was held on April 13, 2021, and the matter was deemed submitted for decision that day.[78]

## II. ANALYSIS

Counterclaim-Defendants' arguments in support of their motion to dismiss the Counterclaims come in three stripes. First, they argue all of the Counterclaims are time-barred. Second, they argue Counterclaim-Plaintiffs fail to state viable claims under Chancery Rule 12(b)(6). Third, they argue Counterclaim-Plaintiffs have failed to plead demand futility under Chancery Rule 23.1. I take up each argument in turn.

### A. Laches

At the threshold, Counterclaim-Defendants argue Counterclaim-Plaintiffs' claims must be dismissed as untimely under an application of laches, as informed by

---

[77] *Id.* (citing C.A. No. 16-ap-2118, Minute Entry (July 31, 2020)).

[78] D.I. 159 (Countercl. and Third-Party Defs.' Opening Br. in Supp. of Mot. to Dismiss Am. Countercls. and Third Party Compl.) ("DOB"); D.I. 172 (Countercl. Pls.' Answering Br. in Opp'n to Countercl. and Third-Party Defs.' Mot to Dismiss Am. Countercls. and Third Party Compl.) ("PAB"); D.I. 181 (Countercl. and Third-Party Defs.' Reply Br. in Supp. of Their Mot. to Dismiss Am. Countercls. and Third-Party Compl.) ("DRB"); D.I. 195 ("Oral Arg. Tr.").

the applicable statute of limitations.[79] "Laches consists of two elements: (i) unreasonable delay in bringing a claim by a plaintiff with knowledge thereof, and (ii) resulting prejudice to the defendant."[80] All of Counterclaim-Plaintiffs' claims are either legal or equitable claims seeking monetary relief.[81] In such instances, it is appropriate for Chancery to look to the "analogous limitations period" as a "strong presumption of laches" subject to rebuttal "either by a recognized tolling doctrine or by the presence of extraordinary circumstances."[82] The parties agree that the limitations period is three years for each of the Counterclaims,[83] and that the statute

---

[79] *See In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007) (explaining laches and statute of limitations are "properly raised on a motion to dismiss").

[80] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013).

[81] *See* Countercl. ¶¶ 91–142.

[82] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 978–83 (Del. Ch. 2016) (providing an overview of relevant caselaw); *see also Baier v. Upper New York Inv. Co. LLC*, 2018 WL 1791996, at *11–12 (Del. Ch. Apr. 16, 2018) ("[A] filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches . . . and prejudice to defendants is thus presumed." (internal quotations and citations omitted)); *CMS Inv. Hldgs., LLC v. Castle*, 2016 WL 4411328, at *2 (Del. Ch. Aug. 19, 2016) ("[T]he Court will bar claims outside the limitations period absent tolling or extraordinary circumstances, even in the absence of demonstrable prejudice." (internal quotations omitted)); *de Adler v. Upper New York Inv. Co. LLC*, 2013 WL 5874645, at *12 (Del. Ch. Oct. 31, 2013) ("The Court does not need to engage in a traditional laches analysis for a presumptively late complaint.").

[83] DOB at 11; PAB at 48–49; *see also* 10 *Del. C.* § 8106 (setting out those actions subject to three-year limitation); *Graulich v. Dell Inc.*, 2011 WL 1843813, at *6 (Del. Ch. May 16, 2011) ("A three-year statute of limitations 'almost universally' applies to stockholder derivative suits for alleged breaches of fiduciary duty in Delaware."); *Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *12 (Del. Ch. Oct. 28, 2011) (recognizing a three-year limitations period for breach of fiduciary duty and aiding and abetting); *Fike v. Ruger*,

begins to run when a claim accrues, meaning "at the moment of the wrongful act and not when the effects of the act are felt."[84]

For limitations purposes, the operative date from which to count backwards is March 31, 2020, the date the Counterclaims were filed.[85] After a careful review of the Counterclaims, it is clear all of the Counterclaims accrued prior to March 31, 2017, except for the claims arising from the Counterclaim-Defendants' efforts to force a settlement between CSM and Richards LLC in the CSM Bankruptcy Case (which arguably accrued in July 2017).[86] In other words, as outlined below, the claims accruing prior to March 31, 2017, were not timely filed:

---

754 A.2d 254, 260 (Del. Ch. 1999) (recognizing a three-year limitations period for breach of contract), *aff'd*, 752 A.2d 112 (Del. 2000); *BTIG, LLC v. Palantir Techs., Inc.*, 2020 WL 95660, at *3 (Del. Super. Ct. Jan. 3, 2020) (recognizing a three-year limitations period for tortious interference and civil conspiracy).

[84] *Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, at *6 (Del. Super. Ct. Feb. 15, 2013) (quoting *Airport Bus. Ctr. V LLLP v. Sun Nat'l Bank*, 2012 WL 1413690, at *7 (Del. Super. Ct. Mar. 6, 2012)). Accrual occurs "even if the plaintiff is ignorant of the cause of action." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).

[85] D.I. 109.

[86] Counterclaim-Defendants assert (in footnotes to their briefs) that the alleged forced settlement "may" still be barred by laches. DOB at 13 n.3, 15 n.4. The argument falls short. First, the fact the argument was relegated to footnotes suggests it is more "an attempt to preserve it than to advance it for serious consideration." *Sylebra Cap. P'rs Master Fund v. Perelman*, 2020 WL 5989473, at *13 n.133 (Del. Ch. Oct. 9, 2020). Second, and more importantly, the Counts touching on the allegations regarding the attempted forced settlement were asserted within the analogous limitations period without resulting prejudice. *See Whittington v. Dragon Gp. L.L.C.*, 2010 WL 692584, at *5 (Del. Ch. Feb. 15, 2010), *aff'd and remanded*, 998 A.2d 852 (Del. 2010) (explaining that defendant bears burden on laches defense and "[t]he primary inquiry is whether it would be

- The claims relating to the "secret side agreement" (featured in all Counts) necessarily accrued no later than December 4, 2015, when "CSM and Noble amended the Noble Loan" to "remedy that purported default."[87]
- The claims relating to Richards and Walker's management of CSM and SMP "in a manner designed to create an event of default under the Noble Loan" (featured in Counts II, III and IV) accrued no later than February 3, 2016, when Counterclaim-Defendants allegedly withdrew their consent to the amendment of the Noble Loan.[88]
- The claims relating to Richards and Walker's alleged abuse of their control position in SMP "to protect the majority ownership stake in SMP held by SMI and [CC] and protect their economic stake in" Richards LLC and its loan (featured in Counts II, III and IV) accrued no later than May 27, 2016, when Counterclaim-Defendants allegedly opposed a receivership action intended to prevent Richards LLC from foreclosing on CSM's assets.[89]
- The claims relating to SMI and CC's efforts to conceal the "secret amendment" of Richards LLC's loan (featured in Counts V and VI) accrued no later than December 4, 2015, when, again, Counterclaim-Plaintiffs allege the Noble Loan was amended to "remedy" the resulting default.[90]
- The claims relating Counterclaim-Defendants' efforts to block "any financing or investment proposal that would take away from the Counterclaim-Defendants['] economic and managerial control of SMP" (featured in Count VI) accrued no later than December 4, 2015, when Counterclaim-Plaintiffs allege the Noble Loan was amended to "remedy" the resulting default.[91]

---

inequitable to permit a claim because the plaintiff's inexcusable delay [led] to an adverse change in the condition or relations of the property or parties. To determine whether delay is inexcusable, the court considers whether the plaintiff exercised that degree of diligence which the situation . . . in fairness and justice require[s]." (internal quotations and citations omitted)); *Levey*, 76 A.3d at 769–70 ("[I]n equity, a lawsuit commenced within the analogous period of limitations is presumed to have been filed within a reasonable time.").

[87] Countercl. ¶ 107.

[88] Countercl. ¶¶ 108, 115(c).

[89] Countercl. ¶¶ 69–70, 115(a).

[90] Countercl. ¶¶ 140(a)–(b).

[91] Countercl. ¶ 53.

- The claims relating to SMI and CC "permitting Richards and Walker to execute consents to permit" Richards LLC to "begin foreclosure proceedings" and "then failing to take any steps" to prevent Richards LLC "from initiating foreclosure proceedings" (featured in Count VI) accrued no later than May 18, 2016, when Counterclaim-Plaintiffs were allegedly "forced to commence a derivative action" to prevent Richards LLC from foreclosing on CSM's assets before voluntarily dismissing their claims shortly thereafter.[92]
- The claims relating to Counterclaim-Defendants' efforts to block "the Delaware receivership action that would have appointed a disinterested receiver" to address Richards LLC's loan and "imminent foreclosure of same" (featured in Count VI) accrued no later than May 27, 2016, when those efforts first surfaced.[93]

The upshot is that Counts I and V are presumptively time-barred in their entirety, while Counts II, III, IV and VI are presumptively time-barred except as they relate to allegations regarding the forced settlement.

Counterclaim-Plaintiffs maintain that none of their claims in Counts II, III, IV and VI are time-barred because one wrongful (albeit disconnected) act alleged in those counts occurred within the applicable limitations period.[94] Though Counterclaim-Plaintiffs cite no cases in support of their theory, and the theory is not entirely clear from the briefing, I gather Counterclaim-Plaintiffs are attempting to invoke a variant of the continuous negligent medical treatment doctrine borne out of

---

[92] Countercl. ¶¶ 68, 140(c).

[93] Countercl. ¶¶ 69–70, 140(d).

[94] *See* PAB at 48–49; Oral Arg. Tr. 129:1–8.

medical negligence cases,[95] whereby the plaintiff attempts to tether discrete harms (in this case as alleged in Counts II, III and VI) to claims for harm brought within the applicable limitations period (in this case the claims relating to the forced settlement) in order to create a coherent, continuing scheme for the purpose of tolling the statute of limitations.[96]

Under Delaware law, when assessing whether claims are timely, our courts generally analyze when each wrongful act upon which a claim is based occurred and hold that claims are time-barred to the extent they are based on wrongful acts that occurred outside the applicable limitations period, regardless of whether other wrongful acts supporting other claims occurred within the applicable period.[97] Thus, even if the Court were inclined to hold that the continuous negligent treatment doctrine could be extended to other tort claims, a dubious proposition, the extension would not aid the Counterclaim-Plaintiffs as the Counterclaims allege separate,

---

[95] *See, e.g.*, *GI Assocs. of Del., P.A. v. Anderson*, 247 A.3d 674, 680 (Del. 2021) (discussing the continuous negligent medical treatment doctrine).

[96] Oral Arg. Tr. 129:3–8 ("[T]his is all intertwined.").

[97] *See Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *13–18, *24 (Del. Ch. June 29, 2005) (permitting claims only to the extent they are based on alleged wrongful acts that "occurred after" the statute of limitations accrual date); *Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005) ("[A]ny possible tolling exception to the strict application of the statute of limitations tolls the statute *only until* the plaintiff discovers (or [by] exercising reasonable diligence should have discovered) his injury." (internal quotations omitted) (emphasis in original)).

21

discrete acts of wrongdoing occurring over the course of several years, which Counterclaim-Plaintiffs discovered and acted to prevent well before Richards and Walker attempted to force a settlement in the CSM Bankruptcy Case. The otherwise time-barred claims do not flow from or relate back to the attempted bankruptcy settlement and the harm related to the time-barred claims accrued independently.[98] Since the purported damages from the alleged wrongful acts were sustained discretely, the breach of duty claims should likewise accrue discretely, rather than cumulatively at the time of the latest discrete act of wrongdoing.[99]

Having determined Counterclaim-Plaintiffs cannot toll the analogous statute of limitations by lashing together discrete claims into an overarching narrative, Counterclaim-Plaintiffs are left with two arguments to preserve the balance of their claims. *First*, Counterclaim-Plaintiffs invoke 10 *Del. C.* § 8118(a) (the "Savings Statute") as a statutory basis to preserve Count I. *Second*, Counterclaim-Plaintiffs argue that all Counts should be deemed timely filed due to lack of prejudice and the presence of unusual circumstances. I address each in turn.

---

[98] *Cf. GI Assocs.*, 247 A.3d at 680 (applying the negligent medical treatment doctrine); *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2016 WL 4440476, at *11–12 (Del. Ch. Aug. 22, 2016) (explaining in the contract context that the doctrine of continuing breach applies only where the plaintiff could have alleged a *prima facie* case for breach of contract after a single incident).

[99] *See Albert*, 2005 WL 1594085, at *13–18, *24.

### 1. The Savings Statute

The Savings Statute, which is "remedial in nature and is liberally construed," "provides exceptions to the applicable statute of limitations in certain instances where the plaintiff has timely filed a lawsuit but is procedurally barred from obtaining a resolution on the merits."[100] It "reflects a public policy preference for deciding cases on their merits."[101] Relevant here, the Savings Statute preserves claims dismissed in another forum "for any matter of form" by allowing parties to refile the claim in Delaware within a year following the dismissal.[102] Counterclaim-Plaintiffs assert that, because the tortious interference claim against Richards and Walker was timely filed in the Adversary Proceeding and was then "avoided or defeated" for a "matter of form" when the Utah Bankruptcy Court dismissed the claim for lack of subject matter jurisdiction, the Savings Statute preserves the claim.

The problem with Counterclaim-Plaintiffs' position is that not all of the Counterclaim-Plaintiffs asserted the tortious interference claims they assert here in the Adversary Proceeding; *only* Waterloo—the lender entity that acquired the Noble

---

[100] *Reid v. Spazio*, 970 A.2d 176, 180–81 (Del. 2009).

[101] *Id.* at 180.

[102] 10 *Del. C.* § 8118(a).

Loan—asserted that claim against Richards and Walker.[103]  Thus, while the Savings Statute clearly works to preserve Waterloo's claim,[104] its application to the other Counterclaim-Plaintiffs is less clear.

While the parties agree there is no Delaware case directly on point,[105] a survey of caselaw in other jurisdictions applying analogous statutes reveals "[a] savings statute does not apply if the parties in the new action are not the same as the ones in the prior action, if the new action is brought against a different defendant than was the first one, or an attempt is made to add defendants not sued in the original action."[106]  "[W]hile only the original plaintiff has a right to bring an action under a savings statute," courts have held that "a change of parties does not preclude an

---

[103] *See* Countercl. ¶¶ 110–28; *Waterloo St. Ltd. v. David Richards LLC*, No. 16-02118-WTT (Bankr. D. Utah July 11, 2017).

[104] Counterclaim-Defendants contend that Waterloo's claim should not be preserved by the Savings Statute because it did not "diligently" pursue that claim, as evidenced by the fact that it has remained inactive since mid-2018.  *See* Countercl. ¶ 80.  But Counterclaim-Defendants admit Waterloo timely pursued its claim under the analogous statute of limitations, and so, in view of all the alleged facts, at this stage, it has demonstrated that it exercised "reasonable diligence" in seeking to hold Counterclaim-Defendants to account for tortious interference. *Spazio*, 970 A.2d at 183; Oral Arg. Tr. 77:19–23 ("We [Counterclaim-Defendants] are conceding that the savings statute would apply to Waterloo if the Court found that there was an attempt to diligently pursue that claim.").

[105] The closest a Delaware court has come to adjudicating the issue was in *Vari v. Food Fair Stores, New Castle, Inc.*, where our Supreme Court held a savings statute did not apply when a new action is brought against a different *defendant* than named in the first action. 205 A.2d 529, 530 (Del. 1964).  The fact pattern here is the inverse, where a new action is brought *by* different *plaintiffs* (as opposed to *against* different *defendants*).

[106] 51 Am. Jur. 2d *Limitation of Actions* § 256 (Nov. 2019) (collecting cases).

24

application of the statute if the change is merely nominal or the interest represented in the renewed action is identical with that in the original action,"[107] Counterclaim-Plaintiffs admit (and indeed, affirmatively plead) that each party's damages flowing from the alleged tortious interference are distinct,[108] making their interests neither nominal nor identical. Those entities could have brought their own tortious interference claim in the Adversary Proceeding yet, for reasons unclear, decided not to.

"A savings statute is designed to ensure that diligent litigants retain the right to a hearing in court until they receive judgment on the merits. Such a statute is designed to provide relief from a statute of limitations to one who has mistakenly brought an action in the wrong court."[109] It is not designed to preserve claims of

---

[107] *Id.* (citing *Smallwood v. Cent. Peninsula Gen. Hosp.*, 151 P.3d 319 (Alaska 2006); *Milburn v. Nationwide Ins. Co.*, 491 S.E.2d 848 (Ga. App. 1997); *Van der Stegen v. Neuss, Hesslein & Co.*, 243 A.D. 122, 276 N.Y.S. 624 (1st Dep't 1934), *aff'd*, 270 N.Y. 55, 200 N.E. 577, 105 A.L.R. 605 (1936); *Hebertson v. Bank One, Utah, N.A.*, 9 UT App 342, 995 P.2d 7 (Utah Ct. App. 1999); *Keener v. Reynolds Transp. Co.*, 61 S.E.2d 629 (W.Va. 1950)).

[108] *See* Countercl. ¶ 109 ("Absent this unjustified and improper conduct [tortious interference], SMP and CSM would have recaptured over $21 million in borrowing capacity to address SMP's and CSM's liquidity position, Waterloo would have obtained a first lien secured position on almost all of CSM's assets, and PacNet would have recovered the $5 million it loaned to CSM on an unsecured basis.").

[109] 51 Am. Jur. 2d *Limitation of Actions* § 253 (internal citations omitted); *see also Spazio*, 970 A.2d at 180 (explaining that "Delaware's Savings Statute provides exceptions to the applicable statute of limitations in certain instances where the plaintiff has filed a timely lawsuit, but is procedurally barred from obtaining a resolution on the merits."); *Gaines v. City of New York*, 109 N.E. 594, 596 (N.Y. 1915) (Cardozo, J.) ("The (saving) statute is

entities who failed to pursue them diligently when they had every opportunity to do so.[110] Thus, while the Savings Statute preserves Waterloo's claims in Count I, the Savings Statute does not save Count I for the other Counterclaim-Plaintiffs.

### 2. There Are No Unusual Conditions or Extraordinary Circumstances

Although delay is presumptively unreasonable when a claim is asserted outside of the analogous statute of limitations period, this presumption can be rebutted for laches purposes by a showing of "unusual conditions or extraordinary circumstances."[111] To discern whether "unusual conditions or extraordinary circumstances" may excuse a late-filed claim, this court generally considers the so-called "*O'Brien* factors," named after the case where they were first identified:

> (1) whether the plaintiff had been pursuing his claim, through litigation or otherwise, before the statute of limitations expired; (2) whether the delay in filing suit was attributable to a material and unforeseeable change in the parties' personal or financial circumstances; (3) whether the delay in filing suit was attributable to a legal determination in another jurisdiction; (4) the extent to which the defendant was aware of, or participated in, any prior proceedings; and (5) whether, at the time

---

designed to insure to the *diligent* suitor the right to hearing in court till he reaches a judgment on the merits. . . . The important consideration is that, by invoking judicial aid, a litigant gives timely notice to his adversary of a present purpose to maintain his rights before the courts." (emphasis added)).

[110] *See Spazio*, 970 A.2d at 180 (explaining that the Savings Statute is implicated "where the plaintiff has filed a timely lawsuit").

[111] *IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 178–79 (Del. 2011).

this litigation was filed, there was a bona fide dispute as to the validity of the claim.[112]

Under the first factor, Counterclaim-Plaintiffs argue the parties have for years been engaged in legal proceedings involving SMP and CSM for conduct related to the claims asserted by both Counterclaim-Plaintiffs and Counterclaim-Defendants.[113] Specifically, Counterclaim-Plaintiffs point to the following actions as implicating *O'Brien*'s first factor:

- In May 2016, DXS and PacNet filed a derivative suit on behalf of SMP and CSM in New York alleging a breach of contract claim against non-party Richards LLC for failing to convert the Richards Loan into equity, as well as an aiding and abetting breach of fiduciary duty claim.[114]
- Counterclaim-Plaintiffs sought appointment of an independent receiver to mitigate concerns that Counterclaim-Defendants were engaging in an imminent breach of fiduciary duty through their alleged actions.[115]
- Counterclaim-Plaintiffs sought appointment of an independent trustee on July 25, 2016, in the CSM Bankruptcy Case to place CSM under the care of a disinterested fiduciary and outside the control of Counterclaim-Defendants, who are alleged to be abusing their positions as creditors to reduce the value of CSM's assets for their own benefit.[116]

---

[112] *Id.* at 178.

[113] *See* Countercl. ¶¶ 68–70, 77–83.

[114] Countercl., Ex. C.

[115] Countercl. ¶¶ 69–70.

[116] C.A. No. 16-bk-24818 (Bankr. D. Utah), D.I. 92.

According to Counterclaim-Plaintiffs, these actions demonstrate their diligent pursuit of the Counterclaims "in various forms" within the analogous statutory period.[117]

Missing from Counterclaim-Plaintiffs' list of their previous litigation efforts is any justification for their failure timely to pursue the *specific claims* at issue here.[118] The New York Action was brought against non-party Richards LLC and was voluntarily terminated shortly after it was filed.[119] The receivership action and the motion in the CSM Bankruptcy Action to appoint an independent trustee for CSM to resolve "deadlock" among CSM's constituencies were both brought in 2016, and neither sought to hold Counterclaim-Defendants liable for any alleged wrongdoing.[120] Indeed, Counterclaim-Plaintiffs do not claim they asserted the

---

[117] PAB at 54.

[118] *See Forman v. CentrifyHealth, Inc.*, 2019 WL 1810947, at *9 (Del. Ch. Apr. 25, 2019) (stating courts expect plaintiff to have been "*diligently and productively* pursuing his rights" before the expiration of the limitations period or to have been "precluded from doing so" (emphasis added)); *Daugherty v. Highland Cap. Mgmt., L.P.*, 2018 WL 3217738, at *10 (Del. Ch. June 29, 2018) (applying statute of limitations where plaintiff brought "different claims" than in prior action). I note that the first *O'Brien* factor's focus on the *specific* claims (and not the existence of litigation between the parties generally) comports with the laches analysis' evaluation of a claim's timeliness based on the *particular* acts at issue (as opposed to lumping together all counts based on a broader narrative theme).

[119] Countercl. ¶ 68.

[120] As noted, Counterclaim-Plaintiffs voluntarily dismissed the receivership action just two months after it was filed. *See* DRB Ex. 5, Notice of Voluntary Dismissal, *DXS Cap. (U.S.) Ltd. v. Skye Mineral Invs., LLC*, No. 12381-VCS (Del. Ch. July 25, 2016); *see also Levey*, 76 A.3d at 772 (noting as to the first factor that the plaintiff "raised substantially identical claims and later reiterated those some claims before the Court of Chancery); *cf. BioVeris*

claims in Counts II–VI in any forum until bringing their Counterclaims at the end of March last year.[121] As for Count I, *only* Waterloo pursued that claim. In all instances, Counterclaim-Plaintiffs admit there was nothing preventing them from asserting their Counterclaims at an earlier point in this litigation or elsewhere.[122]

In *Daugherty v. Highland Capital Management, L.P.*, Vice Chancellor Glasscock held the first *O'Brien* factor weighed against the plaintiff notwithstanding its prior (failed) attempt to amend a preexisting action in Texas to pursue its claims because the plaintiff ultimately "knew that his [Delaware] claims . . . were not under adjudication in the Texas Action" and did not diligently act to pursue them.[123] The court expressly distinguished *IAC* on the grounds that, "[i]n *IAC*, the underlying

---

*Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at \*12 (Del. Ch. Nov. 2, 2017) (holding that a demand letter was insufficient to demonstrate pursuit of a claim to warrant disregarding limitations period), *aff'd*, 202 A.3d 509 (Del. 2019).

[121] *See Daugherty*, 2018 WL 3217738, at \*10 (emphasizing that the plaintiff brought "*different* claims than those decided in" another action and distinguishing its facts from *IAC* on that basis. (emphasis in original)).

[122] Oral Arg. Tr. 132:22–133:2 ("I [Counterclaim-Plaintiffs] wouldn't say there[] [was] anything preventing [pursuit of their claims] *per se* . . . ."); *see also Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 294 (Del. Ch. 2016), *aff'd*, 126 A.3d 1115 (Del. 2015) (finding "unusual or extraordinary circumstances" overcame a presumptive time-bar only after, "[u]nlike a situation in which a plaintiff is injured and then merely waits for years to file her action, the circumstances of this case arguably required" development of a liquidation action before pursuing the claims at bar); *Daugherty*, 2018 WL 3217738, at \*9–10 (finding no unusual circumstances and distinguishing *IAC* and *Levey* on the first factor because the plaintiff in *Daugherty* "knew that his claims regarding the 2013 agreements were not under adjudication in the Texas Action").

[123] *Daugherty*, 2018 WL 3217738, at \*9–10.

29

claims . . . were the same as those brought in Delaware; here, [the plaintiff] brings *different* claims than those decided in the Texas Action."[124]  That logic applies with equal force in this case.[125]

Counterclaim-Plaintiffs attempt to justify their lack of diligence by suggesting that the timing of the Counterclaims was the product of sound litigation strategy.[126] To be sure, parties and their counsel are entitled to make strategic decisions in the course of litigation.  But a parties' strategic calculus must account for the basic math implicated by the applicable statute of limitations.  In this case, Counterclaim-Plaintiffs delayed pursuing their claims without the presence of any impediments. The first *O'Brien* factor, therefore, does not point to the presence of "unusual conditions or extraordinary circumstances."[127]

---

[124] *Id.* at *10 (emphasis in original).

[125] Counterclaim-Plaintiffs attempted at oral argument to distinguish *Daugherty* because, in that case, "years had passed between a jury verdict in Texas before new claims were brought in Delaware."  Oral Arg. Tr. 137:9–13.  But the court in *Daugherty* justified its application of laches because "[u]nlike the plaintiffs in *IAC* and *Levey*, Daugherty knew that his claims regarding the 2013 agreements were not under adjudication in the Texas Action."  2018 WL 3217738, at *9.  Here, as in *Daugherty*, Counterclaim-Plaintiffs knew their claims were not submitted for adjudication in any preceding action, and yet failed to timely pursue them.

[126] *See* Oral Arg. Tr. 130:4–135:22.

[127] *O'Brien*, 26 A.3d at 179.

As for the other *O'Brien* factors, Counterclaim-Plaintiffs concede that the second factor is irrelevant to their tactical delay.[128]  On the third factor, Counterclaim-Plaintiffs suggested for the first time at oral argument that the stayed bankruptcy proceedings tilt that factor in their favor.[129]  But Counterclaim-Plaintiffs had "full control" over their bankruptcy claims during the relevant periods and proactively agreed to stay the Adversary Proceeding in Utah.[130]  Because that proceeding did not concern the claims at issue in this case, Counterclaim-Plaintiffs' delay in bringing those claims cannot fairly be attributed to the voluntary stay.[131]  Like the second factor, the fourth factor is irrelevant since there were no "prior proceedings" where Counterclaim-Plaintiffs pursued the claims they assert here about which Counterclaim-Defendants could have been aware.[132]  Finally, on the

---

[128] *Id.* at 139:14–18.

[129] *Id.* at 139:10–13 (dedicating one sentence to state in conclusory fashion "we'd argue, Your Honor, that the stayed proceedings is relevant to that [fourth factor].").

[130] *See Daugherty*, 2018 WL 3217738, at *10 ("Unlike the plaintiff in *IAC*, who acted promptly in seeking to vindicate his claims in both arbitration and state court, Daugherty chose to wait more than three years to bring suit regarding actions taken in 2013.").

[131] *See id.* at *9.

[132] *See Levey*, 76 A.3d at 766–67, 771 (observing that the prior Southern District of New York proceedings and the arbitration proceedings both took place before the limitations period for Levey's claims expired); *O'Brien*, 26 A.3d at 176, 178 (observing that the prior arbitration proceedings, Florida action and the appeal all occurred before O'Brien's claims expired); *Stewart*, 112 A.3d at 294–96 (observing that the related liquidation action and the receiver's extensive investigation both occurred before the expiration of the statute of limitations).

fifth factor, at this stage, giving all reasonable inferences to Counterclaim-Plaintiffs, their claims qualify as *bona fide* disputes, tipping this factor mildly in their favor. Nevertheless, given the inexplicable delay, "the majority of [*O'Brien*] factors indicate that the 'unusual conditions or extraordinary circumstances' exception should not apply."[133]

*****

In sum, Counterclaim-Defendants' laches defense fails as to Count I for Waterloo and Counts II, III, IV and VI, as they relate to allegations regarding the forced settlement. The balance of Counterclaim-Plaintiffs' claims are barred by laches and, therefore, must be dismissed.[134] I turn now to analyze whether Counterclaim-Plaintiffs have stated viable claims for the surviving counts.

---

[133] *Daugherty*, 2018 WL 3217738, at *9. As in *Daugherty*, many distinctions exist between this case and *IAC* and *Levey*. *See id.* at *10. Most saliently, Counterclaim-Plaintiffs bring *different* claims here than in prior proceedings even though those claims were within their full control. *See IAC*, 26 A.3d at 178–79; *Levey*, 76 A.3d at 771. Further, the court in *Levey* found "plenty of indicia" that the plaintiff there was "treated unjustly"; like *Daugherty*, there are no such circumstances here. *See Daugherty*, 2018 WL 3217738, at *10; *Levey*, 76 A.3d at 768, 773–74.

[134] I note that, while these claims are barred by laches, that does not prevent Counterclaim-Plaintiffs from presenting evidence of Counterclaim-Defendants' misconduct as part of their defenses to set off any potential damages arising from their claims against them. *See Winklevoss Cap. Fund, LLC v. Shaw*, 2019 WL 994534, at *10 (Del. Ch. Mar. 1, 2019).

## B. Chancery Rule 12(b)(6)

The standard for deciding a Motion to Dismiss under Chancery Rule 12(b)(6) is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[135]

I apply that standard first to Count I, and then the remaining Counts as related to the forced settlement.

### 1. Count I – Tortious Interference

In Count I, Counterclaim-Plaintiffs assert a claim for tortious interference with contract against Richards and Walker. "This cause of action follows the Restatement (Second) of Torts, § 766,"[136] and requires Counterclaim-Plaintiffs to prove "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[137] Counterclaim-Defendants do not dispute that there

---

[135] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citation omitted).

[136] *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *10 (Del. Ch. Sept. 22, 2016).

[137] *Skye*, 2020 WL 881544, at *32 (quoting *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013)).

existed valid contracts (the Intercreditor Agreement and the Noble Loan Agreement) of which Richards and Walker were aware, and that their alleged actions in interference with the contracts were intentional.[138] Counterclaim-Defendants argue the tortious interference claim falls short, however, in that Counterclaim-Plaintiffs lack standing to bring it. They also maintain that it is evident on the face of the Counterclaims that any interference was justified, and that neither causation nor damages have been well pled.

As an initial matter, only a party to the contract has standing to bring a claim that another has tortiously interfered with the contract.[139] Waterloo acquired Noble's interests and rights under both the Intercreditor Agreement and the Noble Loan Agreement on or about December 31, 2015, through a Purchase and Sale Agreement ("PSA").[140] According to Counterclaim-Defendants, Counterclaim-Plaintiffs do not have standing to sue for claims that arise from conduct occurring before Waterloo acquired Noble's interests. For reasons explained, I agree that each alleged act must be treated discretely as independent instances of wrongdoing.[141] Waterloo thus lacks

---

[138] *See* DOB at 16–23.

[139] *See Bishop v. Murphy*, 2006 WL 1067274, at *3 (Del. Super. Ct. Apr. 10, 2006); *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 151 (2d Cir. 1995).

[140] Countercl. ¶ 56; PAB, Ex. 3 ("PSA").

[141] While the Utah Bankruptcy Court held that Counterclaim-Defendants are not suing as Noble's assignee for the stated reason that they "are alleging tortious interference with its

34

standing to assert a claim for tortious interference with the Intercreditor Agreement or the Noble Loan Agreement with respect to any conduct that occurred *before* the date of the PSA, unless the PSA contains an express assignment of Noble's claims for torts committed by third parties.

The PSA is governed by New York law, which requires that the "assignment of the right to assert contract claims does not automatically entail the right to assert tort claims arising from that contract."[142] While there is no "specific boilerplate language" required "to accomplish the transfer of causes of action sounding in tort," the agreement must demonstrate a clear intention to do so.[143]

---

contractual and statutory rights under the Noble loan," I respectfully disagree. PAB, Ex. 2 at 30:25–31:3. As a matter of law, non-parties to a contract have "no standing to assert claims for breach of contract or tortious interference with contractual relations." *Bishop*, 2006 WL 1067274, at *3; *Banque Arabe*, 57 F.2d at 151–52; *see also* Restatement (Second) of Torts § 766 cmt. p (1979) (explaining that the "person protected by" the tortious interference rule "is the specified person with whom the third person had a contract that the actor caused him not to perform"). Under New York law (which governs the PSA), the right to assert tort claims previously arising under that contract must be expressly assigned. *Banque Arabe*, 57 F.3d at 151; PSA § 18. Here, it is alleged that, prior to Waterloo's acquisition of the Noble Loan, Counterclaim-Defendants concealed an illegitimate secret side agreement and blocked financing proposals while, at the same time, they were attempting to acquire Noble's interest in the loan. Countercl. ¶ 55. Months later, after losing that bidding contest, Counterclaim-Plaintiffs are alleged to have reversed course and "withdrawn" their consent to the Noble Loan amendment to manufacture a default in a separate effort to "advance their personal economic stake in Richards LLC." Countercl. ¶¶ 57–58, 77, 108. Each of these acts, if well pled, make for discrete tortious acts that cannot be lumped together. *See, e.g.*, Countercl. ¶¶ 129–36 (alleging that the "secret side agreement" makes for a discrete breach of contract claim).

[142] *Banque Arabe*, 57 F.3d at 151; PSA § 18.

[143] *Banque Arabe*, 57 F.3d at 151–52.

35

The PSA assigned to Waterloo "all of [Noble's] interest in and to all of [Noble's] rights and obligations under the [Intercreditor Agreement and the Noble Loan Agreement] and the other Transferred Rights."[144] Transferred Rights is defined to include "all claims, suits, causes of action, and any other right or claim of [Noble], whether known or unknown, against [CSM] or any other Obligor or [SMP] that in any way is based upon, arises out of or is related to any of the foregoing."[145] The term "Obligor" is defined to mean "any Entity . . . that is obligated under the Credit Documents."[146] The term "Entity" is defined to include individuals, and "Credit Documents" is defined to mean "the [Noble Loan Agreement] and all guarantees . . . intercreditor agreements (including without limitation the

---

[144] PSA Ex. A.

[145] *Id.* § 1.2. Counterclaim-Plaintiffs also flag preceding language that Noble transferred "all obligations owed to [Noble] in connection with the Loans" as potentially meaning that Noble assigned to Waterloo its tort claims against any party. *Id.* Under well-settled canons of contract construction, however, the specific governs the general, and the assignment of "all claims, suits, causes of action, and any other right or claim of [Noble]" is clearly the more specific provision with respect to assignments. *See John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary. . . . Thus, where the parties have particularized the terms of a contract an apparently inconsistent general statement to a different effect must yield." (internal quotations omitted)). As a result, the PSA's clause assigning causes of action governs the extent to which the PSA allows Counterclaim-Plaintiffs to pursue Noble's "claims, suits, [or] causes of action" against Richards or Walker.

[146] PSA § 1.2.

[Intercreditor Agreement]) . . . ."[147] Whether the PSA can be understood to assign Noble's right to pursue tort claims against Richards and Walker to Waterloo thus depends on whether they are properly understood to have an "obligation" under the Noble Loan Agreement or the Intercreditor Agreement.

A colloquial definition of "obligate" is "to bind legally or morally; to commit (something, such as funds) to meet an obligation."[148] *Black's Law Dictionary* provides support for this colloquial definition as its definition of "Obligor" equates "someone who has undertaken an obligation" to "a promisor or debtor."[149] Richards and Walker are not legally bound "under the Credit Documents," nor did they commit to undertake an obligation in those documents. Had Noble intended to transfer its existing tort claims against *third parties* to Waterloo, it easily could have done so by simply assigning "all claims, suits, causes of action, and any other right or claim of [Noble], whether known or unknown, against *any* Entity." Instead, it identified specific parties against whom Waterloo could pursue claims, limiting those parties to "Obligors" as opposed to the broader "Entit[ies]." In so doing, it

---

[147] *Id.*

[148] *Obligate*, Merriam-Webster Dictionary (last visited July 25, 2021), https://www.merriam-webster.com/dictionary/obligate; *accord Obligate*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/obligate (last visited July 25, 2021).

[149] *Obligor*, Black's Law Dictionary (11th ed. 2019).

37

made clear that Noble did not assign its claims against third-party individuals like Richards and Walker because they are not "obligated" under the Credit Documents.[150]

The broader agreement supports this reading. As noted, the PSA transferred Noble's "rights and obligations under [the Noble Loan Agreement]" in addition to the other Transferred Rights. Counterclaim-Defendants appear to admit on brief that "obligations" in that clause refers exclusively to Noble's obligations arising from the contract.[151] Because the court must "presume the same words used in different parts of a writing have the same meaning,"[152] the derivative word "obligated" as used in the definition of Obligor should be construed consistently to mean those obligations arising from the contract. With this construction in mind, Counterclaim-

---

[150] *See In re New York City Asbestos Litig.*, 31 A.D.3d 299, 302 (App. Div. 2007) (applying "the standard canon of contract construction *expressio unius est exclusio alterius*, that is, that the expression of one thing implies the exclusion of the other").

[151] *See* PAB at 36 (arguing that the juxtaposition of Noble's "rights and obligations" with "Transferred Rights" must mean that Transferred Rights includes claims sounding in tort).

[152] *Carlyle Inv. Mgmt. L.L.C. v. Moonmouth Co. S.A.*, 2015 WL 5278913, at *14 (Del. Ch. Sept. 10, 2015) (internal quotations omitted). Counterclaim-Plaintiffs argue that, to give effect to the PSA's provision of both Transferred Rights and "obligations" under the Noble Loan Agreement, the Court must understand Transferred Rights to include tort claims. The question, however, is not whether tort claims were transferred for parties "obligated" under the PSA. Rather, the question is who Waterloo has the contractual right to sue, *i.e.*, whether Richards and Walker are individually "obligated" under the PSA. This inquiry distinguishes Counterclaim-Plaintiffs' favorite case, *Banque Arabe*, where it was undisputed the plaintiff received "all 'rights, title and interest'" that included claims against the defendant. 57 F.3d at 151.

Plaintiffs are left with standing to sue only for acts alleged to have occurred after their acquisition of rights under the Intercreditor Agreement and the Noble Loan Agreement, namely those arising from Richards and Walker's withdrawal of their consent to the amendment of the Noble Loan as directors of CSM.[153] Specifically, Counterclaim-Plaintiffs plead that Richards and Walker's withdrawal of their

---

[153] *See* Countercl. ¶¶ 53, 56, 108. At times, the briefing appears to conflict internally and, more importantly, with the Counterclaim's allegations regarding when precisely Richards and Walker withdrew their consent to the amendment to the Noble Loan. *See* DRB at 12, 19 (arguing Richards and Walker's withdrawal of consent occurred prior to Waterloo's acquisition of the Noble Loan in December 2015); PAB at 32 (same); *but see* DOB at 13 (acknowledging the withdrawal of consent occurred "on February 3, 2016"); Oral Arg. Tr. 122:2–11 (Counterclaim-Plaintiffs asserting the withdrawal of consent occurred "in February of 2016"). For their part, the Counterclaims allege: "After the Noble Loan was fully drawn down on February 3, 2016, Counterclaim-Defendants further interfered with Waterloo's economic or contractual relationship by additionally purporting to withdraw consent to the amendment to the Noble Loan in an attempt to place CSM back in default so that Richards LLC would not have to convert the Richards LLC Loan to equity and release its liens against CSM's assets. By virtue of Counterclaim-Defendants' conduct, Richards LLC breached the provision of the Intercreditor Agreement that provided that in the event that the full $30 million of the Noble Loan was drawn down, Richards LLC would 'promptly (but in any event within 5 business days) convert' the Richards LLC Loan in full into the equity of SMP and release all liens held by Richards LLC in and against CSM's assets." Countercl. ¶ 108. In other words, Counterclaim-Plaintiffs plead that, "on February 3, 2016," Richards and Walker tortiously interfered with Waterloo's rights under the Noble Loan Agreement and Intercreditor Agreement, in their capacity as CSM directors, by withdrawing consent to CSM's amendment of the Noble Loan, thereby putting CSM in default and causing Richards LLC not to convert its loan into equity as required under the Intercreditor Agreement. For purposes of this motion to dismiss, the allegations in the Counterclaims, not the allegations in the briefs, control. *See Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at *25 (Del. Ch. Dec. 19, 2017) ("[I]t is impermissible to attempt to amend one's pleading through a brief."). To the extent Counterclaim-Defendants prove at a later stage that the withdrawn consents occurred prior to Waterloo's entry into the PSA, then further issues regarding standing may arise. At this juncture, however, I must accept Counterclaim-Plaintiffs' well pled allegations as true.

consent to the amendment to the Noble Loan caused Richards LLC to breach the Intercreditor Agreement's provision that Richards LLC would promptly convert the Richards LLC Loan in full into the equity of SMP and release all liens held by Richards LLC in and against CSM's assets.[154]

Counterclaim-Defendants argue that Richards and Walker cannot be held liable for tortious interference with the Intercreditor Agreement because they were at all times acting on behalf of Richards LLC and CSM, who are parties to that contract.[155] Under the "affiliate exception" to the standing rule, the court focuses on the extent to which the defendant is truly a "stranger" to the contract and the business relationship underpinning the contract.[156] In this regard, "officer[s] or director[s] may be held personally liable for tortious interference with a contract of the corporation if, and only if, [they] exceeded the scope of [their] agency in so doing."[157] Where, as here, a claim for tortious interference is alleged against "individuals or entities that share common 'economic interests' with a party to the

---

[154] Countercl. ¶ 108.

[155] DOB at 20.

[156] *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2013 WL 5863010, at *12 (Del. Ch. Oct. 21, 2013).

[157] *Local Union 42 v. Absolute Envtl. Servs., Inc.*, 814 F. Supp. 392, 400 (D. Del. 1993); *see also Grand Ventures, Inc. v. Paoli's Rest., Inc.*, 1996 WL 30022, at *2–3 (Del. Ch. Jan. 4, 1996) (citing with approval the holding of *Local Union 42*).

contract, Counterclaim-Defendants must 'demonstrate that an interference by an affiliated entity was motivated by some malicious or other bad faith purpose.'"[158] The standard for bad faith is a "stringent" one,[159] which in this context requires a showing that the defendant is not "pursuing . . . the legitimate profit seeking activities of the affiliated enterprises."[160] In other words, Counterclaim-Plaintiffs must well plead that Richards and Walker were acting "without justification."[161]

Counterclaim-Plaintiffs have adequately alleged that Richards and Walker acted in bad faith as directors of CSM. Specifically, Counterclaim-Plaintiffs allege that, after learning Waterloo acquired the Noble Loan, Richards and Walker exploited their control over CSM and SMP to withdraw their previously awarded consent for the amendment to the Noble Loan, in an effort to put CSM back in default under that loan, for the *sole* purpose of enriching themselves to the detriment of SMP and CSM.[162] In view of Richards and Walker's fiduciary duties under the SMP

---

[158] *Skye*, 2020 WL 881544, at *33 (quoting *AM Gen. Hldgs.*, 2013 WL 5863010, at *12).

[159] *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006).

[160] *AM Gen. Hldgs. LLC*, 2013 WL 5863010, at *12.

[161] *Skye*, 2020 WL 881544, at *32.

[162] Countercl. ¶¶ 99, 106.

Agreement, Counterclaim-Plaintiffs well plead those bad faith actions exceeded the scope of their agency.[163]

Counterclaim-Defendants maintain, nevertheless, that they cannot be liable for tortious interference if they acted on behalf of the creditor, Richards LLC, invoking *Redbox Automated Retail LLC v. Universal City Studios LLLP* for the proposition that a defendant acting to defend a "legally protected interest" is not acting "without justification."[164] Counterclaim-Defendants' theory appears to be that Richards and Walker were acting as agents for Richards LLC when they withdrew their consent and, therefore, are insulated from personal liability.

Though no Delaware case appears to have dealt with the precise issue presented here (i.e., a tortious interferer acting in bad faith as a fiduciary to a debtor in service of a creditor counterparty in which the fiduciary holds an interest), the court in *Redbox* expressly derived the rule on which Counterclaim-Defendants rely from the Restatement (Second) of Torts § 773, which requires that the protection of an interest is undertaken "by appropriate means."[165] As its comments make clear,

---

[163] *See Int'l Ass'n of Heat and Frost Insulators and Asbestos Workers Local Union 42 v. Absolute Envtl. Servs., Inc.*, 814 F. Supp. 392, 400 (D. Del. 1993) (citing Restatement (Second) § 770 as setting out the scope of an officer or director's agency, which requires that the actor "(a) does not employ wrongful means and (b) acts to protect the welfare of the third person.").

[164] PAB at 13; *Redbox*, 2009 WL 2588748, at *6.

[165] Restatement (Second) of Torts § 773; *see also id.* § 770 (providing that an actor "charged with responsibility for the welfare of a third person" who "intentionally causes that person

42

Restatement (Second) § 773 "is of narrow scope and protects the actor *only* when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means."[166] Moreover, "justification defenses under Sections 769 and 773 [of the Restatement (Second) of Torts] present fact-intensive inquiries that are typically not appropriate for disposition on a motion to dismiss."[167] It is, at bare minimum, reasonably conceivable that the bad faith acts of a fiduciary resulting directly in the alleged interference with an existing contract are improper means for Richards and Walker to pursue Richards LLC's ends.[168] Because Counterclaim-Plaintiffs have well pled

---

not to perform a contract . . . does not interfere improperly with the other's relation if the actor (a) *does not employ wrongful means* and (b) acts to protect the welfare of the third person." (emphasis added)).

[166] Restatement (Second) of Torts § 773 cmt. A (emphasis added).

[167] *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *12 (Del. Ch. Sept. 22, 2016); *see also Encite LLC v. Soni*, 2008 WL 2973015, at *8 (Del. Ch. Aug. 1, 2008) (noting that the propriety of a tortious interference defendant's effort to preserve legally protected rights presents issues of fact rarely suitable for treatment on a dispositive motion).

[168] *See* Restatement (Second) of Torts, § 773 cmt. a, illus. 2 (illustrating that a party with an honest belief in a right cannot enforce that right by working through improper means); *see also id.* § 767 (setting out factors to consider in determining whether interference is improper, which include, *inter alia*, the nature of the actor's conduct, the actor's motive, the interests of the other with which the actor's conduct interferes, and social policy concerns); *id.* cmt. c ("The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it. The propriety of the means is not, however, determined as a separate issue unrelated to the other factors. . . . Conduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper.");

Richards and Walker's interference was unlawful and, therefore, executed by inappropriate means, Counterclaim-Defendants have proffered no basis to avoid Richards and Walker's liability for tortious interference as a matter of law.[169]

In a last gasp, Counterclaim-Defendants argue Counterclaim-Plaintiffs fail to allege causation and damages arising from Richards and Walker's conduct. But Counterclaim-Plaintiffs affirmatively plead that, but for Richards and Walker's interference, the Noble Loan would have been fully drawn down and Richards LLC would have been forced under the Intercreditor Agreement to "promptly (but in any event within 5 business days) convert" the Richards LLC Loan into equity of SMP and release all liens held by Richards LLC against CSM's assets, thereby allowing Waterloo to obtain first-lien creditor status prior to the bankruptcy proceedings.[170] Counterclaim-Plaintiffs further plead that, as a result of Richards and Walker's tortious interference, Waterloo's position as a senior secured creditor of CSM was

_Encite_, 2008 WL 2973015, at *7 (noting that, "[t]o state a claim of tortious interference, [the plaintiff] must allege _either_ an improper motive _or_ means . . . ." (emphasis added)).

[169] I note Counterclaim-Defendants cite to _Morgan Asset Hldg. Corp. v. CoBank, ACB_, an Indiana case holding that a creditor could not be held liable for tortious interference where it did not act "exclusively" to injure another creditor by renegotiating its loan agreement with a third party. 736 N.E.2d 1268 (Ind. Ct. App. 2000). While Indiana similarly appears to follow the Restatement for its tortious interference analysis, there were no allegations in _Morgan_ that the creditor achieved its contractual renegotiation by improper means, as Richards and Walker are alleged to have done here. _See id._ at 1271–73.

[170] Countercl. ¶¶ 108–09.

substantially and negatively impaired, resulting in damages.[171] At this stage, those allegations suffice to well plead causation and damages.[172] Accordingly, Waterloo has stated a claim for tortious interference.

## 2. Counts II and VI – Fiduciary Duty Claims

Counterclaim-Plaintiffs individually and, with respect to DXS and PacNet, derivatively on behalf of SMP, allege Richards and Walker (Count II) and SMI and CC (Count VI) breached their fiduciary duties to SMP, DXS and PacNet. There is no dispute that Richards, Walker, SMI and CC owed fiduciary duties to SMP, DXS and PacNet as managers and entities with economic, managerial and voting control of SMP.[173] Given the preceding laches analysis, these claims are confined to the alleged settlement Richards and Walker attempted to force between CSM and Richards LLC, which was "designed to give the Counterclaim-Defendants ownership of CSM's assets and extinguish SMP's economic interest in CSM."[174]

According to Counterclaim-Defendants, DXS and PacNet allege injury that is solely derivative of the alleged injury SMP suffered, and so their direct claims must

---

[171] Countercl. ¶¶ 109–10.

[172] *Pharm. Prod. Dev., Inc. v. TVM Life Sci. Ventures VI, L.P.*, 2011 WL 549163, at *7 (Del. Ch. Feb. 16, 2011) ("[W]hat is important at the pleadings stage is that [the plaintiff] has given the [defendant] sufficient notice as to the damages it is claiming.").

[173] *Skye*, 2020 WL 881544, at *22; Countercl. ¶ 51.

[174] Countercl. ¶¶ 73, 115(d).

45

be dismissed. I take up that issue before addressing Counterclaim-Defendants' arguments that Counterclaim-Plaintiffs failed to well plead the elements of breach of fiduciary duty.

### a. The *Tooley* Analysis

As noted, DXS and PacNet assert breach of fiduciary duty claims in Counts II and VI, both directly and derivatively on behalf of SMP. Counterclaim-Defendants counter that the direct claims are improper. In evaluating whether a claim is direct or derivative, Delaware courts consider "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[175]

Here, DXS and PacNet allege Counterclaim-Defendants owed them fiduciary duties and, as part of a conspiracy, breached those duties by stifling the marketing process for CSM's assets, adopting resolutions that advantaged Richards LLC in the CSM Bankruptcy Case and prohibiting CSM from entering into any settlement with Counterclaim-Plaintiffs regarding the Noble Loan without the approval of both Richards and Walker.[176] In its rejection of the proposed settlement, the Utah

---

[175] *Tooley v. Donaldson Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

[176] Countercl. ¶¶ 73–74, 140.

Bankruptcy Court observed that Richards and Walker had "significantly undermined the CROs' authority [in order] to ensure the Sale Process was favorable to Richards and Walker," including by overruling the CRO with a Board vote "[w]hen the CROs' recommendations did not favor Richards or Walker."[177]

Neither side contests that Richards and Walker's actions, if well pled, would result in derivative claims because they allegedly diminished the value of SMP. But where "the allegedly faithless transaction involves an extraction from one group of stockholders, and a redistribution to another, of a portion of the economic value and voting power embodied in the minority interest," "the same claims can have direct aspects."[178] In *CMS Investment Holdings, LLC v. Castle*, this court held that a plaintiff stated a direct claim where "certain Defendants allegedly breached their fiduciary duty of loyalty by actively concealing their misconduct and by deceptively engineering a foreclosure sale in which the pre-ordained outcome was a sale of the Company's assets to themselves for less than full value."[179] That holding applies by analogy here because, as alleged, Counterclaim-Defendants harmed Counterclaim-

---

[177] Countercl., Ex. D at 28–32.

[178] *CMS Inv. Hldgs.*, 2015 WL 3894021, at *8 (internal quotations omitted).

[179] *Id.* at *9; *see also Kelly v. Blum*, 2010 WL 629850, at *11 (Del. Ch. Feb. 24, 2010) (holding direct claims were well-pled where it was alleged that managers of LLC undertook actions to eliminate plaintiff's interests in the LLC). I note that Counterclaim-Defendants never attempted on brief to distinguish *CMS* even though the decision was featured prominently in Counterclaim-Plaintiffs' papers.

Plaintiffs by working to stymy a bidding process by which Counterclaim-Defendants sought to squeeze out DXS and PacNet, and emerge as the sole owners of SMP. It is reasonable to infer that Counterclaim-Defendants' actions infringed DXS and PacNet's rights and diminished their holdings individually by effectively working to reallocate their shares in SMP to Counterclaim-Defendants. Because both the harm and benefit of any recovery would accrue to DXS and PacNet independently, they well plead a direct claim.

### b. Counterclaim-Plaintiffs Have Well Pled a Fiduciary Breach

At the threshold, Counterclaim-Defendants argue that both Counts II and VI fail for lack of any reasonably conceivable damages arising from a failed *attempt* to accomplish an objective that Counterclaim-Plaintiffs affirmatively plead was not actually realized.[180] Damages, of course, are not an element of a claim for fiduciary breach under Delaware law. Rather, "[t]o establish liability for the breach of a fiduciary duty, a plaintiff must demonstrate that the defendant owed her a fiduciary duty and that the defendant breached it."[181] Once proven, the court may fashion a remedy to address the breach of fiduciary duty, including by an award of nominal damages.[182] In any event, Counterclaim-Plaintiffs plead that Counterclaim-

---

[180] Countercl. ¶ 75

[181] *Estate of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011).

[182] *See, e.g.*, *Ravenswood Inv. Co., L.P. v. Estate of Winmill*, 2018 WL 1410860, at *2, *25 (Del. Ch. Mar. 21, 2018) (awarding nominal damages for breach of fiduciary duty);

Defendants' actions significantly chilled the bidding process and so resulted in Counterclaim-Defendants receiving less than they would have received through a proper process.[183] While Counterclaim-Plaintiffs may ultimately be unable to prove such damages, their allegations suffice at the pleading stage to put Counterclaim-Defendants on notice of the damages they are claiming, and that is all that is required.[184]

Counterclaim-Defendants' remaining arguments are trained on Count II, particularly as the allegations focus on Richards and Walker. Counterclaim-Defendants argue Richards and Walker's alleged actions during the CMS Bankruptcy Case are protected by the business judgment rule.[185] They also argue that CSM's entry into the "zone of insolvency" expands the managers' fiduciary duties to creditors, and so Richards and Walker cannot be understood to have acted unreasonably or improperly in accounting for Richards LLC's creditor rights.[186]

---

*Ivize of Milwaukee v. Complex Litig. Supp., LLC*, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009) (same).

[183] *See* Countercl. ¶¶ 73, 75; PAB at 25.

[184] *Pharm. Prod. Dev.*, 2011 WL 549163, at *7 ("[W]hat is important at the pleadings stage is that [the plaintiff] has given the [defendant] sufficient notice as to the damages it is claiming.").

[185] DOB at 32; DRB at 22–23.

[186] DOB at 34 (citing *In re Essar Steel Minn. LLC*, 602 B.R. 600, 607 (Bankr. D. Del. 2019) (quotation marks and citation omitted)).

While it is true that a company's entry into the zone of insolvency gives creditors standing to bring derivative claims, "[t]he fiduciary duties that creditors gain derivative standing to enforce are not special duties to creditors, but rather the fiduciary duties that directors owe to maximize value for the benefit of all residual claimants."[187] As alleged, Counterclaim-Defendants' attempt to force a settlement between Richards LLC and CSM was motivated purely out of self-interest, working against the best interests of CSM in order to benefit themselves as residual claimants.[188] Indeed, Richards and Walker's actions prompted the Utah Bankruptcy Court to reject the proposed settlement expressly *because* it was motivated by self-interest and personal gain and was not in the best interest of CSM.[189]

"[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[190] Because Counterclaim-Plaintiffs have well pled that Counterclaim-Defendants breached their duty of loyalty and failed to act independently in the best interests of SMP and CSM,

---

[187] *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 176 (Del. Ch. 2014) (citing *N. Am. Catholic Edu. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007)).

[188] Countercl. ¶¶ 73–75.

[189] Countercl. ¶ 75, Ex. D.

[190] *Skye*, 2020 WL 881544, at *22 n.287 (internal quotations omitted).

the business judgment rule's presumptions do not apply.[191]  Counterclaim-Plaintiffs'

allegations thus allow a reasonable inference that Richards, Walker, SMI and CC's

forced settlement was attempted for their own self-interest and to CSM's detriment,

in breach of their fiduciary duties of loyalty.

### 3. Count III – Aiding and Abetting

In Count III, Counterclaim-Plaintiffs bring claims against SMI and CC for

aiding and abetting in Richards and Walker's breach of fiduciary duty.  To state a

claim for aiding and abetting breach of fiduciary duty, "a complaint must plead facts

in support of four elements: (1) the existence of a fiduciary relationship, (2) a breach

of fiduciary duty, (3) defendant's knowing participation in that breach and

(4) damages proximately caused by the breach."[192]  Given my finding that

Counterclaim-Plaintiffs have well pled Richards and Walker breached their

fiduciary duties to CSM such that they are entitled to damages if proven, all elements

except for SMI and CC's knowing participation in the breach have been well pled.[193]

---

[191] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) (explaining the business judgment rule "can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment").

[192] *Skye*, 2020 WL 881544, at *29.

[193] *See Lake Treasure Hldgs., Ltd. v. Foundry Gill GP LLC*, 2014 WL 5192179, at *1, *13 (Del. Ch. Oct. 10, 2014) (finding nominal damages on an aiding and abetting claim).

"To establish scienter, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper, and that he acted with an illicit state of mind."[194] "A claim of knowing participation need not be pled with particularity"; rather, a party need only plead "factual allegations . . . from which knowing participation can be reasonably inferred."[195] "A court's analysis of whether a secondary actor 'knowingly' provided 'substantial assistance' is necessarily fact intensive."[196] And, where it is well-pled that a third party "attempted to create or exploit conflicts of interest in a board," it is reasonably conceivable that the third-party aided and abetted that board's breach of fiduciary duty to the members of an LLC.[197]

Counterclaim-Plaintiffs allege that Richards controlled SMI and Walker controlled CC.[198] Because Richards and Walker were "the fiduciary and primary wrongdoers," and also allegedly "control[led] [SMI and CC] or [] occupie[d] a sufficiently high position [such] that [their] knowledge is imputed to" those

---

[194] *Skye*, 2020 WL 881544, at \*29 (internal quotation marks and citations omitted).

[195] *Id.* (internal quotations and citations omitted).

[196] *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at \*42 (Del. Ch. Aug. 27, 2015).

[197] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015).

[198] Countercl. ¶¶ 9–12.

entities,[199] "the knowing participation test is 'easier to satisfy.'"[200] Counterclaim-Plaintiffs further allege that SMI and CC, as members of SMP, appointed Richards and Walker respectively to the boards of both SMP and CSM.[201] While on the boards, Richards and Walker are alleged to have leveraged their control over SMI and CC to frustrate CSM's bankruptcy process, worked to extinguish DXS and PacNet's equity interest in SMP, and divested SMP of its interest in CSM.[202] On these allegations, Counterclaim-Plaintiffs have stated a reasonably conceivable claim that SMI's and CC's participation was knowing and "legally improper."[203]

### 4. Count IV – Civil Conspiracy

Finally, in Count IV, Counterclaim-Plaintiffs bring a claim for civil conspiracy against all Counterclaim-Defendants, alleging SMI and CC (as majority members of SMP) and Richards and Walker (as majority managers of SMP) conspired to tortiously interfere with the Noble Loan Agreement and in breach of

---

[199] *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *49 (Del. Ch. Oct. 16, 2018).

[200] *BrandRep, LLC v. Ruskey*, 2019 WL 117768, *6 (Del. Ch. Jan. 7, 2019) (quoting *In re PLX Tech.*, 2018 WL 5018535, at *49).

[201] Countercl. ¶ 1.

[202] Countercl. ¶¶ 73–75, 121.

[203] *Skye*, 2020 WL 881544, at *29; *see also BrandRep*, 2019 WL 11768, at *6 (sustaining aiding and abetting claim where director allegedly "owned or controlled the Entity Defendants, such that his knowledge of his alleged breaches of fiduciary duties owed to [the company] is imputed to both Entity Defendants").

their fiduciary duties. To state a claim for civil conspiracy, Counterclaim-Plaintiffs must allege "(1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage."[204]

I have already determined that Counterclaim-Plaintiffs have well pled that Counterclaim-Defendants were engaged in an unlawful attempt to force a settlement between CSM and Richards LLC in breach of their fiduciary duties, and that SMI and CC aided and abetted Richards and Walker's fiduciary breaches. I have also found that Counterclaim-Plaintiffs have stated a claim for tortious interference. Moreover, I have held each of these acts resulted in reasonably conceivable damages. Counterclaim-Defendants are thus left to attack the existence of the conspiracy itself. Indeed, Counterclaim-Defendants' only argument in support of dismissal of this Count (beyond the absence of a predicate breach) is that a member of an LLC cannot conspire with the LLC for purposes of civil conspiracy.[205] Accordingly, say Counterclaim-Defendants, neither Richards nor Walker could have conspired with SMI or CC.

While it is true that "a corporation generally cannot be deemed to have conspired with its officers and agents," an exception to this rule exists "when the

---

[204] *Skye*, 2020 WL 881544, at *31 (citation omitted).

[205] DOB at 36 (citing *Universal Cap. Mgmt., Inc. v. Micco World, Inc.*, 2012 WL 1413598, at *4 (Del. Super. Ct. Feb. 1, 2012); *Amaysing Techs., Corp. v. CyberAir Commc'ns, Inc.*, 2005 WL 578972, at *8 (Del. Ch. Mar. 3, 2005)).

officer or agent of the corporation steps out of her role as an officer or agent and acts pursuant to personal motives."[206]  "Courts interpreting the 'personal [motives]' exception . . . have read it to mean a 'personal animus and/or desire for financial benefit other than one's corporate salary.'"[207]  Counterclaim-Plaintiffs have pled that Walker and Richards acted "pursuant to personal motives" by conspiring with SMI and CC (majority member entities they fully controlled) to protect their economic interest in Richards LLC's loan.[208]  Because it is reasonably conceivable Richards and Walker were conspiring with SMI and CC to force a bankruptcy settlement for their personal financial benefit, the conspiracy count is well pled.[209]

## C. Demand Futility

Finally, Counterclaim-Defendants argue Counterclaim-Plaintiffs lack standing to bring Counts II, IV and VI derivatively on behalf of SMP because they do not allege facts excusing pre-suit demand as futile.  I disagree.

---

[206] *Amaysing Techs.*, 2005 WL 578972, at *7; *accord Skye*, 2020 WL 881544, at *10.

[207] *Amaysing Techs.*, 2005 WL 578972, at *8.

[208] Countercl. ¶¶ 1–4, 17, 21, 40, 86, 121, 140–41.

[209] *See LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2018 WL 1559936, at *15 (Del. Ch. Mar. 28, 2018).

This court will excuse demand on a corporation where a plaintiff alleges "particularized facts showing that demand would have been futile."[210] Demand is futile where a plaintiff's "particularized factual allegations . . . create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[211]

A plaintiff may raise a reasonable doubt about the board's ability impartially to consider a demand by well-pleading that, *inter alia*, a majority of company's directors face a "substantial likelihood" of liability.[212] "To plead that a member of the Demand Board faces a substantial likelihood of liability . . . , a plaintiff need not demonstrate a reasonable probability of success on the claim, as that would be unduly onerous."[213] "Although framed as a substantial likelihood of liability, the

---

[210] *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *9 (Del. Ch. Mar. 19, 2019).

[211] *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). The parties do not engage on whether the Court should analyze demand futility under *Aronson* or *Rales*. *See Aronson*, 473 A.2d at 811–12; *Rales*, 634 A.2d at 934. Because the outcome of the analysis is the same under *Aronson* or *Rales*, I apply *Rales*. *See United Food & Commercial Workers Union v. Zuckerberg*, 250 A.3d 862, 889 (Del. Ch. 2020).

[212] *Rales*, 634 A.2d at 936.

[213] *In re CBS Corp. S'holder Class Actions and Deriv. Litig.*, 2021 WL 268779, at *31 (Del. Ch. Jan. 27, 2021) (internal quotations omitted).

standard [ ] only requires that plaintiffs make a threshold showing, through the allegation of particularized facts, that their claims have some merit."[214]

I am satisfied that Counterclaim-Plaintiffs' allegations of breach of fiduciary duty satisfy Chancery Rule 23.1's particularity requirements as to Richards and Walker, who constitute a majority of SMP's Board. Counterclaim-Plaintiffs have alleged with particularity how both parties acted to abuse their power in order to better position Richards LLC to acquire CSM's assets on the cheap, to SMP's detriment.[215] Indeed, as already noted and as Counterclaim-Plaintiffs allege, the court overseeing CSM's bankruptcy expressly found that Richards and Walker had "significantly undermined the CROs' authority [in order] to ensure the Sale Process was favorable to Richards and Walker," including by overruling the CRO with a board vote "[w]hen the CROs' recommendations did not favor Richards or Walker."[216] Because Counterclaim-Plaintiffs have cleared their threshold burden to plead with particularity that Richards and Walker face a substantial likelihood of liability in Counts II, III, IV and VI, demand is excused.

---

[214] *Zuckerberg*, 250 A.3d at 887 (internal quotations omitted).

[215] Countercl. ¶¶ 73–76.

[216] Countercl. ¶ 75 (citing Countercl., Ex. D at 28–32).

## III. CONCLUSION

For the foregoing reasons, Counterclaim-Defendants' motion to dismiss Count V is **GRANTED**. Counterclaim-Defendants' motion to dismiss Count I is **DENIED** as to Richards and Walker's withdrawal of consent to amend the Noble Loan and **GRANTED** as to the balance of the alleged acts. Counterclaim-Defendants' motion to dismiss Counts II, III, IV and VI is **GRANTED** as to all alleged acts except the alleged attempt to force a settlement in the CMS Bankruptcy Action and, as to Count IV, the surviving claim for tortious interference. Otherwise, the motion is **DENIED**. Notwithstanding the dismissal of claims, Counterclaim-Plaintiffs may present evidence of Counterclaim-Defendants' alleged misconduct to defend against or set off any potential damages arising from the affirmative claims asserted against them.[217]

**IT IS SO ORDERED.**

---

[217] *Winklevoss Cap.*, 2019 WL 994534, at *10 (citing *King Const., Inc. v. Plaza Four Realty, LLC*, 2012 WL 3518125 at *4 (Del. Super. Ct. Aug. 7, 2012) ("Ordinarily a defendant may amend a pleading to assert an affirmative defense even where the statute of limitations or other considerations would bar the assertion of a substantially similar counterclaim."); *PNC Bank, Del. v. Turner*, 659 A.2d 222, 225 (Del. Super. Ct. 1995) (permitting an affirmative defense of recoupment where the defendant's proposed counterclaim would have been barred by the statute of limitations, finding "the underlying policy of the statute of limitations is not promoted by suppressing a valid defense arising out of a transaction" and the "purpose of statutes of limitation is to bar actions and not to deny matters of defense. As a general rule, such statutes are not applicable to defenses, but only where affirmative relief is sought. [. . .] It would therefore be appropriate for [defendant] to plead her claims [. . .] defensively whether or not they would be barred if pleaded affirmatively.").